## BARBOUR et al. v. THOMAS et al.*

### CONNOLLY v. THOMAS.

#### Nos. 7116, 7117.

Circuit Court of Appeals, Sixth Circuit.

Nov. 11, 1936.

*Writ of certiorari denied 57 S. Ct. 513, 81 L. Ed. —.

See, also, 7 F.Supp. 271.

James Turner and J. O. Murfin, both of Detroit, Mich. (James Turner, J. O. Murfin, Frank E. Robson, George H. Klein, Lewis H. Paddock, Edwin C. Lewis, Charles B. Warren, Paul Voorhies, Angell, Turner, Dyer & Meek, Miller, Canfield, Paddock & Stone, Beaumont, Smith & Harris, Warren, Hill, Hamblen, Essery & Lewis, Clark, Klein, Ferris & Cook, Goodenough, Voorhies, Long & Ryan, and Lewis & Watkins, all of Detroit, Mich., of counsel), for appellants.

Robert S. Marx, of Cincinnati, Ohio (Nichols, Morrill, Wood, Marx & Ginter, of Cincinnati, Ohio, on the brief), for First Nat. Bank-Detroit.

William Henry Gallagher and A. W. Sempliner, both of Detroit, Mich. (S. Reymont Paul, of Detroit, Mich., on the brief), for Wm. F. Connolly, receiver.

Before HICKS and ALLEN, Circuit Judges, and WEST, District Judge.

HICKS, Circuit Judge.

Prior to 1929 there were in Detroit, Peoples Wayne County Bank, Bank of Michigan, and the Peninsular State Bank, banking corporations under the laws of Michigan; the Detroit & Security Trust Company, a trust company under the laws of that state; and the First National Bank. These corporations were independent units, though some of them operated numerous branches.

1929 was a year of bank consolidations and mergers in Detroit. As early as May, 1928, a bank stock holding company, the Union Commerce Investment Company, had been organized. Early in 1929, a second such holding company, the Guardian Detroit Group, Inc., was incorporated. Neither of these groups began business with capital. They simply issued shares of stock in exchange for the shares of the banks which they absorbed. By October, 1929, these two groups controlled forty different institutions and before the year was out had merged, and were known as the Guardian Detroit Group.

In this atmosphere the idea of the formation of the Detroit Bankers Company herein called the "holding company" was born. It was nurtured by the soaring market price of the stock of the two older companies and by notions of business expedience. It was thought that smaller independent banks were at a disadvantage in competing for the business of large concerns with huge monetary requirements. To continue to exist, these banks had to have business and to obtain it they had to operate as a unit large enough to meet the demands. The organizers were also impressed with the possibilities of more economical control and operation of grouped units through the elimination of duplicating facilities. Certain of their officers and stockholders believed it would be beneficial to organize a corporation under the general corporation law of the state of Michigan to acquire the stock of each of them. Committees were formed, meetings were held and a plan was formulated.

The purpose of this new corporation was stated in its articles of association as follows: "To acquire, own, hold, vote and exercise all rights of ownership of and to sell and dispose of shares of the capital stock of banks and trust companies, and of other companies or associations engaged in purchase and sale on their own account, or as agents of others, underwriting or dealing in corporate or other securities, or of any other corporation engaged in any business or activity incidental to or related to or of assistance in the conduct of any such business." Under the Michigan statute (Comp.Laws of Mich. 1929, § 9968) there was nothing per se illegal in the organization of the holding company for such a purpose.

It was not difficult for the organizing committee, consisting of two representatives from each of the units, to persuade the boards of directors to endorse the project and the stockholders later to acquiesce therein. The five boards met separately on September 27, 1929, and recommended the plan to the stockholders. It called for a capitalization of $50,000,000, $35,000,000 of which was to be issued immediately in exchange for the stock of the five constituent banks. The shares were valued at $20 each and of the 1,750,000 exchanged, the stockholders of the Peoples Wayne County Bank, the largest, were to get 825,000; those of the First National 335,000; of the Detroit and Security Trust Company 300,000; of the Bank of Michigan, 187,500; and of the Peninsular State 102,500. The proposed dividend rate was set at 17 per cent. or

$3.40 per share, which was slightly in excess of the rates then being paid on an equal value of the bank shares.

On September 27 and 28, 1929, the organizers announced through the newspapers that the new group would be one of the strongest institutions in the country, with a capital, surplus, and undivided profits of around $90,000,000, and resources of over $725,000,000.

On October 5, 1929, a joint letter was sent by the officers of the five banks to their stockholders, describing the proposed agreement and recommending the exchange of their stock for that of the holding company, and the signing of the agreement and of a power of attorney to a named committee to put the scheme into effect. The committees consisted of the president and vice president of the Peoples Wayne County Bank, the chairman of the board and presidents respectively of the First National Bank, the Detroit & Security Trust Company, and the Bank of Michigan, and the president of the Peninsular State Bank. The other three were directors of the Peoples Wayne County Bank.

The plan was to become effective as soon as two-thirds in amount of the stock of the units was deposited for exchange. More than 97 per cent. of the stockholders signed the agreement and power of attorney. This instrument designated the "committee" as the agent and attorney of all the stockholders signing it. It authorized the committee to organize the holding company for the initial purpose of acquiring the shares of the five several banks. It provided that in addition to the capital stock above referred to there should be 120 shares of no par value called "trustee shares" which should be issued, 10 shares each, to the persons composing the committee, for the benefit of all stockholders coming into the plan. These trustee shares could not participate in dividends, assets, or subscription rights, but they possessed the exclusive voting power in the election of directors until December 31, 1934, at which time they were to be redeemed and canceled upon the payment of $10 per share. The proceeds from these shares, a total of $1,-200, represented the only capital which the holding company owned at the time of its organization. The trustee shares were not paid for by the trustees but by the banks. The only other assets the hold-

ing company had were the bank stocks transferred to it by the constituent units in exchange for its stock. This agreement also provided that, *"The common stock issued by said corporation shall be subject to the same liability as shares of the capital stock of a bank and/or trust company organized in Michigan and/or shares of the capital stock of a national bank."* (Italics ours.) It further provided that only persons holding trustee shares should be elected directors and that upon the removal of a director or his death, his shares should be surrendered and his successor selected from the unit company which he had represented. This agreement was subsequently modified to permit an increase in the number of directors made necessary by the acquisition of additional banks.

Following the agreement the committee issued a "declaration of trust" in which each member declared that the trustee shares should be held by them in trust for the use and benefit of the common stockholders of the holding company and their successors, representatives, and assigns; that the committee should thereafter be designated as "trustees" and that the principal trust upon which the trustee shares were created was that the same should be voted at all elections of directors for persons who were holders of 10 shares thereof, and that each trustee should have the right to vote for himself for director. The declaration embodied the phrase, to wit, "the spirit of the foregoing being to perpetuate a proportionate representation of each of the foregoing institutions or their successors during the period of the trust."

The committee functioned until the filing of the articles of association on January 8, 1930, when it succeeded itself as the board of directors. The first meeting of the board, made up of the same twelve men, was held on January 9, 1930. The board functioned until March 28, 1933, when it sought a dissolution of the company.

During its existence the holding company, as authorized by its charter, exchanged its stock for the stock of other banks in and around Detroit and thereafter many of these banks were consolidated with others of the group. Because of its position as the sole stockholder of record of these many institutions, the holding company prior to each annual meeting

listed the persons it wished elected to the various boards. These lists of proposed directors appeared in the minutes along with the designation of the men who should vote the stock of the holding company at the various annual meetings. There was never any doubt that the holding company's slate would be elected. The holding company would issue to newly elected directors qualifying shares of stock but by an agreement with the directors these shares remained the property of the holding company upon which it received dividends.

The expenses of the holding company were met by the levy of "Service Charges" on the various units. Two schemes were tried of allocating the charges. The first was on the basis of the proportion the gross income of each unit bore to the cost to the holding company but the one which prevailed charged each unit for the amount of the work that was actually done for it. This seems to have become somewhat a matter of form since the assessments came to be made periodically on the larger units (apparently whenever the holding company happened to need money) and in round numbers, rather than on any exact basis. This money went into a variety of avenues as shown by the treasurer's reports—including salaries, certain stock purchases and liquidation of notes incident to the acquisition of small units throughout the state, donations, dinners, rentals, advertising, directors' fees, etc.

At first the holding company paid regular quarterly dividends of 85 cents per share, at the 17 per cent. rate fixed in the agreement. But these payments were reduced to sixty cents per share on March 31, 1932; and to 25 cents on June 30, 1932, and December 31, 1932. They were paid out of dividends received from the constituent units and to meet them the directors of the holding company would suggest to the various units the amount each would be expected to pay and without exception these recommendations were followed by the directors of the individual units, some of whom were always holding company directors.

The holding company set up numerous committees to study plans for effecting various economies in accounting, auditing, advertising, printing, etc. These committees had no power to impose their plans upon the units, but they took their suggestions to the various boards with the result that considerable uniformity was effected through the setting up of separate departments under the management of the holding company to which the units yielded their work. The holding company concerned itself with such matters as interlocking directorates with member banks of the Guardian group; and representation of the holding company on the boards of banking institutions in which First National Company (a subsidiary of First National Bank) had bought an interest. From the outset it was beset with the problem of helping the First National Company to carry charges on its investment of approximately $7,200,000 in the stocks of various banks throughout the state. The holding company borrowed money to liquidate this indebtedness of the First National Company upon which it made repayments from regular as well as special dividends received from the unit banks.

The record is replete with divers other activities of the holding company in behalf of various units which are set forth in the court's finding of facts.

Since the holding company had no substantial assets except the stock of its units, it was manifest that the creditors and depositors of the component banks were afforded no real protection either under the federal statute providing for double liability of shareholders (section 63, Tit. 12 U. S.C. [12 U.S.C.A. § 63]) or under a statute of the state of Michigan with similar provisions. This was a matter of vital importance not only to the holding company and the banks, but to the public. The Attorney General of Michigan, its Securities Commission, and its Superintendent of Banks were greatly concerned about it. After much discussion the signers of the "Agreement and Power," as an express condition upon which the holding company would be permitted to function, consented to incorporate into its articles of association the following clause:

"Article IX-A. The holder of each share of common stock of this corporation shall be individually and severally liable for such stockholders' ratable and proportionate part determined on the basis of their respective stock holdings of the total issued and outstanding stock of this corporation, for any statutory liability imposed upon this corporation by reason of its ownership of shares of capital stock of any bank or trust company, and the stock-

holders of this company by the acceptance of their certificates of stock of this company, severally agree that such liability may be enforced in the same manner and to the same extent as statutory liability may now or hereafter be enforceable against stockholders of banks or trust companies under the laws under which said banks or trust companies are organized to operate."

"A list of the stockholders of this company shall be filed with the Banking Commissioner of Michigan or the Comptroller of the Currency whenever requested by either of those officers."

This clause was likewise printed on the reverse side of each certificate of stock issued by the holding company.

The First National Bank-Detroit, one of the units of the holding company which had grown out of a consolidation of two other units, closed its doors on February 11, 1933, and never reopened. On February 14 the Governor of Michigan declared a banking holiday. This proclamation was effective through February 21, 1933, on which date he issued a second one, permitting the opening of banks for very limited purposes. On March 6, 1933, the President ordered the suspension of all banking activity to and including Thursday, March 9. This holiday was extended indefinitely by a second proclamation on March 9, 1933. On March 13, 1933, the Comptroller of the Currency appointed Paul C. Keys conservator for the bank and he continued as such until March 21, when he was succeeded by C. O. Thomas, who acted in that capacity until he was appointed receiver on May 11, 1933. On May 16, 1933, the Comptroller levied assessments for the full amount of the capital stock of the bank, to wit, $25,-000,000 upon its shareholders, but on May 10, 1933, the holding company had been dissolved by decree of an appropriate state court and Wm. F. Connolly had been appointed its receiver. Later, on July 28, 1933, a petition in bankruptcy was filed against it.

The receiver, Thomas, announced his intention of collecting from the stockholders of the holding company about $14 per share, calculated upon the estimate that each share of the holding company stock represented the ownership of .14055775 shares of First National Bank-Detroit stock.

He could not commence an action before July 31, 1933, since the assessments were not due until that date. George H. Barbour and some thirty others, representing about one and one-half millions of holding company stock, anticipated Receiver Thomas and brought suit on July 12, 1933, as a class action on behalf of themselves and all other stockholders to enjoin the threatened enforcement against them of any liability upon the assessments. They were later joined by other stockholders as interveners which brought the total amount of stock represented in the suit to over $4,000,000.

Paragraphs 6, 7, 8, 9, 11, 12, 13, and portions of 10 and 14 of the bill alleged, as a basis of nonliability, negligent and wasteful acts of interference by Keys, conservator, Thomas, conservator and receiver, and of the Comptroller and his agents during the months of February, March, and April 1933, which acts it was averred caused the insolvency of the bank; that its resources on February 11, 1933, the date it closed, exceeded its deposits by $73,259,224; that its assets then exceeded its liabilities by more than $25,000,000; that the agents of the Comptroller made a thorough examination of the bank in November and December, 1932, and reported it sound; that on December 31, 1932, its board paid a dividend of $2.10 per share, which payment was sanctioned by the agents of the Comptroller; that its financial condition did not materially change between that date and the 14th day of February, 1933; that the only authentic information possessed by the Comptroller on the 14th day of February, 1933, regarding its financial condition was derived from his representatives who made the examination in November and December, 1932; that if after that date and before May 12, 1933, the Comptroller received information tending to show that the bank was insolvent on February 14, 1933, such information was misleading and fraudulent; that the bank remained closed in compliance with the proclamations of the Governor and the President and that the conservator and other agents of the Comptroller would not permit it to do a banking business or carry on its affairs in the usual and normal way; that the unusual and unprecedented circumstances occurring between February 11, and May 11, 1933, the date upon which the Comptroller declared the bank to be insolvent, were not

caused by any act or failure on the part of the officers and directors of the bank, and were not within the legal contemplation of the stockholders of the Detroit Bankers Company when they accepted their stock upon which article IX was indorsed.

The bill made Wm. F. Connolly, receiver of the holding company, a party defendant, and sought to enjoin him from bringing suit against its stockholders on account of the aforesaid assessment. Exhibit 6 to the bill was a "Contract for the Sale of Assets by Conservator for First National Bank-Detroit to National Bank of Detroit" made on April 12, 1933, which plaintiffs asserted was in violation of the Bank Conservation Act and which they claimed transferred the assets at a valuation far below their real worth.

A restraining order issued against both Thomas and Connolly which was later superseded by an interlocutory injunction. Receiver Connolly answered and stated that before proceeding to enforce any assessment against the stockholders of the holding company he would seek the instruction of the state court which appointed him but denied that the stockholders of the holding company were responsible for the debts of the bank. Receiver Thomas answered and also filed a cross-bill or counterclaim. The answer denied generally the averments of the bill but admitted that as conservator he had sold certain assets. He denied, however, that they were sold below their worth. He denied any waste, but asserted that, even so, the plaintiff's allegation to that effect was immaterial.

In his cross-bill or counterclaim Receiver Thomas alleged that the Comptroller had made the assessments on the shareholders of the capital stock of the bank; and that he, Thomas, had notified plaintiffs and intervening petitioners, owners of record of the stock of the holding company. He further alleged that the stockholders of the bank and trust company, in order to assure depositors and creditors that they remained the real and beneficial stockholders, notwithstanding they had gone to the pretense of changing their unit shares for those of the holding company, caused to be inserted in the articles of association of the holding company article IX, whereby each of the plaintiffs, intervening petitioners and approximately 9,000 other shareholders of the holding company by the acceptance of their certificates of stock, entered into a contract to pay their ratable and proportionate part of any assessment on the shareholders of the bank. He alleged that the list of the shareholders of the holding company was filed with the Comptroller; that they exercised all the rights and privileges of shareholders of the bank and controlled, operated, and manipulated it to their own ends; that to obtain and hold the public confidence and insure depositors and creditors of the bank they published statements and advertisements to the effect that the liabilities imposed by the laws of the United States and of Michigan for the protection of depositors and creditors were enforceable against the shareholders of the holding company just as against shareholders of other banks.

Plaintiffs' answer to the cross-bill or counterclaim raised no new issue, but closed with a motion to dismiss. The answer of Receiver Connolly thereto was that he, only, had a right to enforce the assessment and he likewise moved to dismiss the cross-bill or counterclaim. Certain interveners also filed an answer which adopted the answer of plaintiffs.

The court dismissed plaintiffs' bill and all intervening petitions, together with all motions to dismiss the cross-bill or counterclaim of Receiver Thomas, and rendered a decree against plaintiffs and interveners for the assessment upon the stock of the bank in proportion to the number of shares of the holding company stock held by each of them. It further decreed that Receiver Connolly had no interest in these judgments.

█ Plaintiffs and interveners, appealing, made numerous assignments of error, which in the briefs are compressed into a very few issues. The first was that the court erred in granting the motion of Thomas, receiver, to strike out paragraphs 6, 7, 8, 9, 11, 12, 13, and parts of 10 and 14 of the bill, hereinbefore condensed, and in denying proposed evidence in support thereof.

We cannot yield to this insistence. These averments and the evidence offered to sustain them could not have been put in issue here. They constitute a purely collateral attack upon the action of the Comptroller (not a party litigant) in declaring the bank insolvent, and upon his judgment as to the necessity for the assessments and the amount thereof. His

determination of these matters was conclusive. U.S.C. tit. 12, § 191 (12 U.S.C. A. § 191); Kennedy v. Gibson, 8 Wall. 498, 505, 19 L.Ed. 476; Germania National Bank v. Case, 99 U.S. 628, 634, 25 L.Ed. 448; Casey v. Galli, 94 U.S. 673, 677, 24 L.Ed. 168; Crawford v. Gamble, 57 F.(2d) 15, 16 (C.C.A.6) and cases there cited; Silk et al. v. Ake, Rec'vr, 83 F.(2d) 618, 620 (C.C.A.6); Miller v. Stock, 65 F.(2d) 773, 90 A.L.R. 1061 (C.C.A.3); Liberty Nat. Bank v. McIntosh, 16 F.(2d) 906, 909 (C.C.A.4); and B. V. Emery & Co. v. Wilkinson, 72 F. (2d) 10 (C.C.A.10).

■ Appellants concede the widely adjudicated immunity of the Comptroller from collateral attack on the wisdom of his determination of insolvency, etc., but their argument is that the statute (section 191 supra) should have no application where insolvency was caused by unwarranted interference and control of governmental agencies and where the circumstances were so extraordinary as not to have been anticipated.

We are not in accord with appellants' contention. It must be observed that the holiday proclamations and regulations were supplemented and supported by the emergency bank act which has been held valid (City of East Cleveland v. Fidelity & Deposit Co. (D.C.) 5 F.Supp. 212); but apart from this, the liability of a stockholder in a national bank does not depend upon a judicial determination, whether the banking holidays were well advised, whether the conservator discreetly managed the assets, or whether crucial and unforeseen circumstances led to insolvency. His obligation is fixed by statute. Title 12 U.S.C. § 64 (12 U.S.C.A. § 64); Page v. Jones, 7 F.(2d) 541, 544 (C.C.A.8). When he subscribes for his stock he agrees to be "responsible for all contracts, debts, and engagements of such association, each to the amount of his stock therein, at the par value thereof, in addition to the amount invested in such stock." Upon the insolvency of the bank he agrees to discharge his obligation in such amounts and in such manner as shall be determined by the Comptroller. The statute admits of no exception and we can make none. Creditors and depositors have a right to expect that it will be observed and complied with as it is written. Bailey v. Tillinghast, 99 F. 801, 808 (C.C.A.6); Crawford v. Gamble, supra; Silk v. Ake, supra; DeWeese v. Smith, 106 F. 438, 442, 66 L.R.A. 971 (C. C.A.8); Meeker v. Baxter, 83 F.(2d) 183, 186 (C.C.A.2); United States Nat. Bank of La Grande v. Pole, 2 F.Supp. 153, 157 (D.C.); Bailey v. Sawyer, 2 Fed.Cas. p. 382, No. 744 (D.C.).

The Congress probably did not foresee the cataclysmic conditions existing in and around Detroit in the early part of 1929, but we see no logic in, nor necessity for, abrogating the statute simply because the circumstances were unusual. On the other hand, it seems to us that the more unparalleled the situation, the greater the need for depositors' protection. If assets of the bank were being wasted by the alleged illegal action of state and federal officials it occurs to us that the directors of the holding company, instead of acquiescing, would have resorted to the courts to stop it. Bailey v. Tillinghast, supra, 99 F. 801, 808. They do not seem to have thought of that relief.

■ We have proceeded upon the assumption that appellants were stockholders of the bank. They insist that they were not, that they had exchanged their certificates for those of the holding company, the stockholder of record. Ninety-one and three-tenths per cent. of appellants were signers of the "Agreement and Power" and owners of their holding company stock by original exchange, one-half of one per cent. obtained their stock in exchange for the stock of others of subsequently acquired institutions. The remainder obtained their certificates in other ways. But the statute (section 64, tit. 12 U.S.C. [12 U.S.C.A. § 64]) does not restrict liability for assessments to stockholders of record or to those holding certificates. Congress wisely declined to limit the term "stockholders." It recognized that bank stock is capable of ownership without any certificate therefor having been either issued, recorded, or delivered; and, further, that stock might be owned by one person and the certificate registered in the name of another. See Pacific Nat. Bank v. Eaton, 141 U.S. 227, 334, 11 S.Ct. 984, 35 L.Ed. 702. It has been uniformly and wisely held that the actual owners of the capital of a national bank, that is, those who have their money invested therein, are "shareholders" and liable to assessment. Forrest v. Jack, 294 U.S. 158, 162, 55 S.Ct. 370, 371, 372, 79 L.Ed. 829, 96 A.L.R. 1457; Early v. Richardson, 280 U.S. 496, 499, 50 S.Ct. 176, 177, 74 L.Ed. 575, 69 A.L.R. 658;

Ohio Valley Nat. Bank v. Hulitt, 204 U. S. 162, 168, 27 S.Ct. 179, 51 L.Ed. 423. The law fixes the obligation upon those who profit from the confidence of the depositors and from the use of their money.

■ We concur in the finding that appellants are "actual owners" of the stock of the bank upon which the assessment was levied. The stockholders never sold their stock. They simply exchanged it for holding company shares. The holding company certificates represented the interests which the shareholders of each unit held or acquired in the assets of the group. None of its stock was sold to the public nor issued to any persons other than the stockholders of the banks or their assignees. Article III of the articles of association clothed it only with the ordinary powers of a holding company. The stockholders of the banks had no intention of retiring from the banking business. They organized the holding company for the protection and promotion of their common interests because they realized that the banks acting separately were at a disadvantage in competing with the Guardian-Detroit Union group. Their primary purpose was to centralize the control and operation of the five unit banks and from time to time acquire control of additional ones by the exchange of holding company stock for other stocks. They were careful to provide that the holding company should be under the exclusive control of officers and agents of the component banks at least until December 31, 1934.

Article IX must be considered in the light of the circumstances under which it was adopted. The Michigan statute imposing individual liability upon the stockholders of state banking institutions to the extent of the amount of their stock, was quite similar to the federal statute applicable to national bank stockholders. The stockholders of the bank signing the "Agreement and Power" as well as the organizing committee, knew that each stockholder was liable for assessment under either the Michigan or federal statutes and that if they should be allowed to transfer their stock to the holding company outright the vital purpose of the statute, that is, the protection of creditors and depositors, would be nullified because the holding company, without assets other than the bank stocks, would fail if the banks should fail. They knew that such a contrivance would not be permitted, or, if permitted, would result in disaster because cautious depositors would hesitate or decline to continue their patronage. So, by article IX, they assumed the statutory liability of the holding company as the record holders of the bank stocks and agreed that such liability might be enforced against them. They evidenced their obligation by the acceptance of their certificates in the holding company upon the reverse side of which article IX was printed and which was referred to in the face thereof. Apparently it was expected that the liability of shareholders would shift as new banks were acquired, or as old ones were merged, so that depositors would always be protected. There was no hardship on new stockholders or transferees because all were warned by the provision in the certificates.

Appellants urge upon us the case of Backus v. Connolly, 268 Mich. 495, 256 N.W. 496, decided after the decree below. In that case stockholders of the holding company sought to enjoin Connolly, its receiver, from enforcing any liability against them based on article IX upon the ground that it was void. The Michigan Supreme Court declined to hold it void, but ruled that the holding company was the owner of the banks' stock and liable to assessments thereon under both federal and state statutes; that article IX constituted an agreement between the holding company and its stockholders, enforceable by the receiver; and that they would be liable for the holding company's statutory liability. The holding company was of course the record owner of the stock of the bank as listed with its president and cashier (U.S.C. tit. 12, § 62 [12 U.S.C.A. § 62]) but the court did not hold that an assessment under the federal statute was not enforceable against its stockholders as the real or actual owners of the banks' stock. That question was not in issue and neither the Comptroller nor receiver was a party to that suit.

■ We have no quarrel with the ruling that, as between the stockholders of the holding company and its receiver, article IX-A constitutes a contractual obligation. It seems to us that this "super-added" liability (Backus v. Connolly, supra) imposed by the stockholders upon themselves constitutes additional evidence that they

regarded themselves in their relationship to the creditors and depositors of the bank as the true and real owners of its stocks; and designed that the creditors and depositors should have that real protection which the law demanded rather than an irresponsible promise, and that this vitally important matter should not be subject to any doubtful interpretation.

The signers of the "Agreement and Power" no doubt had this purpose in mind when they included therein the provision that the stock of the holding company should be subject to the same liability as stock of a state or national bank, to be enforced in the same manner and to the same extent as statutory liability was enforceable against stockholders of banks by the laws under which they were organized and that a list of the stockholders should be filed with the Banking Commissioner of Michigan or the Comptroller of the Currency whenever requested.

But, all this to one side, we are applying a federal statute in a suit by the receiver of a national bank to enforce the personal liability of its real shareholders for the benefits of its creditors and depositors. From this viewpoint the insistence that article IX-A was in violation of the Michigan statute of frauds is unimportant.

From the same reason the claim of cross-appellant Connolly, receiver, that he has the right to collect the assessments, is foreclosed. The statute (title 12, § 192 U. S.C. [12 U.S.C.A. § 192 and note]) specifically vests this right in Receiver Thomas under the direction of the Comptroller. See Richmond v. Irons, 121 U.S. 27, 49, 7 S.Ct. 788, 30 L.Ed. 864; and Forrest v. Jack, supra.

The decree of the District Court is affirmed.