[No. 26753. Department Two. July 8, 1938.]

HOWARD H. HANSEN, *as State Supervisor of Banking, Appellant,* v. JAY AGNEW *et al., Respondents.*[1]

[1]Reported in 80 P. (2d) 845.

*Bausman, Oldham, Cohen & Jarvis* and *Simon Wampold, Jr.*, for appellant.

*C. D. Cunningham* and *W. N. Beal*, for respondents.

ROBINSON, J.—This action was brought against certain stockholders of an insolvent bank, the First Farmers-Merchants Bank & Trust Company of Centralia, to enforce the liability created by Art. 12, § 11, of the constitution of the state of Washington. This section reads, in part, as follows:

"Each stockholder of any banking or insurance corporation or joint stock association shall be individually and personally liable equally and ratably, and not one for another, for all contracts, debts, and engagements of such corporation or association accruing while they remain such stockholders, to the extent of the amount of their stock therein at the par value thereof, in addition to the amount invested in such shares."

For a number of years after the adoption of the constitution, there was no statute relating to the enforcement of this liability. In 1907, an act providing for the forming of banking corporations touched briefly upon the matter in the following language which we quote from § 18, p. 524, chapter 225 of the Session Laws of that year:

"Such liability may be enforced by an action at law or suit in equity by any such bank in process of liquidation, or by any receiver or other person succeeding to the legal rights of such bank."

By § 3, chapter 98, Laws of 1915, p. 280, a comprehensive statute regulating the administration and liquidation of insolvent state banks, it was provided, among other things, that the state examiner

". . . may, if necessary to pay the debts of such bank or trust company, enforce the individual liability, if any, of the stockholders. . . ."

In 1917, a still more comprehensive act was passed, chapter 80, p. 271, in which the matter was dealt with in § 35, p. 290. That section, which appears in Rem. Rev. Stat., § 3242 [P. C. § 285], states the existing law and reads as follows:

"The stockholders of every bank and trust company shall be individually and personally liable, equably and ratably, and not one for another, for all contracts, debts and engagements of such corporation accruing while they remain as stockholders, to the extent of the amount of their stock therein at the par value thereof, in addition to the amount invested in such shares. Persons holding stock as executors, administrators, guardians or trustees, if such relation of trust shall appear in the stock certificate and on the books of the corporation, or as collateral security or in pledge, shall not be personally liable as stockholders, but the assets and funds in the hands of such trustees constituting the trust shall be liable to the same extent as the testator, intestate, ward, or person interested in such funds would be, if living or competent to act, and the person pledging such stock shall be deemed a stockholder and liable under this section. Such liability may be enforced by the examiner as soon after taking possession of any bank or trust company as in his judgment the same may be necessary. The failure of the stockholders of any bank or trust company immediately upon possession being taken by the examiner to make good all im-

pairment of its assets shall be conclusive evidence that the enforcement of double liability is necessary."

It will be noted that the statute adds nothing to the constitutional requirement other than the provision that persons holding stock in certain representative capacities shall not be held personally liable; that the liability may be enforced by the examiner and as soon after taking possession as in his judgment that action shall seem necessary; and that the failure of the stockholders to make good an impairment shall be conclusive evidence of such necessity; that is to say, enforcement by the examiner is authorized, but no procedure is prescribed.

Prior to December, 1931, there were three banks in the city of Centralia, the First Guaranty Bank, the Farmers & Merchants Bank, and the First National Bank. In keeping with the times, their deposits had been shrinking, and the market value of the bonds in their portfolios had depreciated. In addition to this, the officers of the banks had come to the conclusion that there was an unnecessary duplication of service, and that one strong bank with greater resources could better serve the requirements of the community. The matter was discussed with the state banking department, which took a similar view of the matter.

In December, 1931, with the full knowledge and approval of the supervisor, the officers and the stockholders of the three banks organized a new bank to displace the three old banks. The new bank was called the First Farmers-Merchants Bank & Trust Company, and is hereinafter spoken of as the bank. Simultaneously, and as part of the reorganization plan, a corporation was formed, known as the Southwest Guaranty & Investment Co., hereinafter called the holding company.

The bank had one thousand shares of a par value of one hundred dollars each. We are unable to find, among the great mass of books and papers which constitute the exhibits, a copy of the stock subscription, but it is recorded in the minutes of the first meeting of the stockholders of the bank that twelve former officers of the old banks, naming them, subscribed for ten shares each, and the holding company, for the balance. These twelve men were slated to become, and did become, the directors of the bank. It is indicated by statements in the briefs and also by stray bits of evidence in the record that the beneficial ownership of the stock for which they thus subscribed was understood to be in the holding company.

The holding company, owning all of the stock of the bank, issued its own stock, proportionately, to the stockholders of the three old banks. Consequently, after the formation of the new bank, the stockholders of the old banks no longer owned, of record, bank stock of any kind, but only holding company stock.

In pursuance of the plan, all the assets of the old banks were conveyed to the new bank, with the exception of the buildings formerly occupied by the First Guaranty Bank and the Farmers & Merchants Bank, and certain furniture and fixtures. This real and personal property, together with the stock of the new bank, constituted the assets of the holding company. All officers of the old banks became officers of the new bank. All of the officers and directors of the holding company were also officers or directors of the new bank.

The holding company never had an independent office or a telephone of its own. It had no stationery. It did not even pay for its own books of account. It paid no salaries to its officers. All its receipts and disbursements related to the two buildings, with the ex-

ception of two items, $23.86 disbursed for revenue stamps for its stock certificates, and $77.50 for corporation tax. The expense for a corporate seal and all expenses of incorporation, including the attorney's fees, seem to have been defrayed by one of the old banks or the new bank.

The holding company had but one financial transaction. In June, 1932, it purchased certain bonds from the new bank for thirty thousand dollars. These bonds had a market value of something less than three thousand dollars and had been ordered out of the bank by the banking department as non-acceptable assets. In order to secure an acceptable asset in lieu of these bonds, the bank sold them to the holding company for thirty thousand dollars, taking in payment notes for that amount secured by mortgage upon the holding company's two buildings.

The new bank began doing business on December 14, 1931. In a little less than a year, on the 3rd of December, 1932, a moratorium was declared by the mayor of Centralia, and the bank closed. A deputy bank examiner of the department of banking then entered the bank, was given full access to all its records and files, and on February 15, 1933, the supervisor took charge of the bank for liquidation. On February 16th, the next day after he formally took over the bank for liquidation, but more than two months after he had had daily access to its records, the supervisor of banking made a formal assessment of one hundred per cent as to the superadded liability of the stockholders of the new bank.

On February 15th, the stockholders of record appear to have been ten directors, each holding ten shares, and the holding company, holding nine hundred shares. One thousand dollars was demanded from each of the ten directors, and ninety thousand dollars from the

holding company. Seven of the ten directors paid the full one thousand dollars assessed against them, most of them promptly. Two or three paid in installments.

In March, 1933, the holding company transferred all its physical assets to the supervisor. One of the instruments (Exhibit J-1), dated March 29, 1933, reads, in part, as follows:

"For and in consideration of part payment of the superadded liability assessed to the Southwest Guaranty Investment Company on the capital stock of the First Farmers-Merchants Bank & Trust Company, now in liquidation, we hereby assign, transfer and deliver unto Howard H. Hansen, Supervisor of Banking, . . ." etc. (Here follows a description of the bonds formerly purchased from the bank by the holding company.)

A similar instrument of March 30, 1933, also recited to be in part payment (Exhibit J-2), assigns certain amounts due from tenants of the two buildings, and by deed acknowledged on March 30th the buildings were also conveyed.

Among the papers in the two bales of exhibits brought to this court is a file of inter-office correspondence of the state banking department, which shows that, in the fall of 1933, some member of the department heard of a case decided in the United States district court of the eastern district of Michigan on April 6, 1933, in which it was held that, where stockholders in several banks consolidated such banks into a new bank by exchanging their stock for holding company stock, in enforcing the superadded liability the record ownership might be disregarded and action taken against the beneficial owners. It was tacitly agreed within the department to withhold further action looking to the enforcement of the superadded liability of the Centralia bank until the attorneys then represent-

ing the department could secure copies of the briefs from the Detroit attorneys who had successfully conducted the Michigan case.

In June, 1934, the department, with permission of the superior court which had supervision of this liquidation, employed the attorneys now representing it as special counsel. On September 14, 1934, the supervisor of banking sent notices and demands to each of the stockholders of the old banks who had received stock in the holding company in exchange for their bank stock and were holding it at the time the new bank closed its doors. Except as to names, addresses, number of shares, and specific amounts demanded, these notices, omitting the signature and seal of the supervisor, were as follows:

"OFFICE OF
"HOWARD H. HANSEN, SUPERVISOR OF BANKING
"Liquidating First Farmers-Merchants Bank & Trust Company, Centralia, Washington
"NOTICE OF STOCK ASSESSMENT
"Jay Agnew,
"602 F. Street,
"Centralia, Wash.

"NOTICE IS HEREBY GIVEN that I, the undersigned, have ascertained that the liabilities of the First Farmers-Merchants Bank & Trust Company, of Centralia, Washington, exceed its assets by more than $100,000.00; and I have this day levied an assessment upon the superadded liability of the capital stock of said bank to the full extent of the par value thereof, to-wit: $100.00 per share.

"You are the owner of $118\frac{2}{3}$ shares of the capital stock of said Bank; and demand is hereby made upon you that you pay to the undersigned immediately the sum of $11,866.66 by reason of this assessment, together with interest thereon at the rate of 6% per annum from the date hereof.

"DATED at Olympia, Washington, this 13th day of September, 1934."

In each and all of these notices the amount claimed from each individual was four times what it should have been. Although no explanation of this mistake is made in the record, we think it must have occurred in the following way: The holding company was capitalized for three hundred thousand dollars, divided into twelve thousand shares of twenty-five dollars each; the bank, for one hundred thousand dollars, divided into one thousand shares of one hundred dollars each. Four shares in the holding company therefore represented (on plaintiff's theory) beneficial ownership of but one share in the bank. Apparently, this was not understood by the clerk who prepared the notices, and the number of shares used in each case was the number of shares owned in the holding company. For example, in the notice above quoted, Mr. Agnew is said to be the owner of 118⅔ shares of the bank, and therefore demand is made for $11,866.66. He did own 118⅔ shares in the holding company, but that represented a beneficial ownership in but 29⅔ shares of the bank, and the demand should have been for $2,966.66. We have been compelled to go into this matter at such tedious length because respondents vigorously contend that this mistake or series of mistakes vitiated and avoided the whole assessment.

No stockholder having responded, the appellant filed this action on September 25, 1934. The complaint set out the history of the organization of the bank and the holding company; that the bank became insolvent on February 15, 1933; that the impairment was not made good; that the plaintiff determined, on September 13, 1934, that a one hundred per cent assessment must be made; and that he levied such assessment on that date upon all the shareholders, except the holding company. Various exhibits were attached and incorporated by

reference. Paragraph VIII, containing the prayer for relief, reads as follows:

"Attached hereto is Exhibit 'F' containing the names, addresses of all defendants (with the exception of the holding company), the number of shares each defendant in fact owns in the new bank and the amount of the assessment for which each of said defendants is liable to the plaintiff on their respective superadded liability. The said defendants, and each of them, have failed to pay said assessment, or any part thereof.

"WHEREFORE, the plaintiff prays as follows:

"(1) That an accounting be had between all of the personal defendants and the holding company to determine the amount of the nominal stock holding of each defendant in the holding company and that the holding company make full disclosure of its assets, liabilities, corporate activities and its relation to and dealings with each of the defendants and the new bank.

"(2) That each of the defendants (except the holding company) be decreed the real owners of the new bank stock standing in the name of the nominal record owners and liable for the assessment as shown on Exhibit 'F.'

"(3) That the court decree that the proportion of each stockholder's interest in the holding company constitutes his proportional interest and stock ownership in the First-Farmers Bank.

"(4) That judgment be entered against each defendant for such sum as shall represent such ratio of ownership.

"(5) For such other relief as to the court may seem appropriate, and for costs and disbursements herein."

Nowhere in the complaint is there any reference to the assessment made on February 16, 1933, nor to the fact that, acting in pursuance thereof, the plaintiff collected seven thousand dollars from the directors, nor to the fact that the holding company, in response to the demand then made, turned over to the supervisor its tangible assets, buildings, bonds, and accounts. Some

effect, however, was given to the fact that collections had been made from the directors.

It will be noted that the complaint expressly declares that no judgment is sought against the holding company. Nor is there any attempt in this action, if we correctly interpret the record, to collect from the directors with respect to their qualifying shares. We deduce this from the fact that one thousand dollars was collected from Lee Proffitt, and in this suit recovery is sought from Proffitt with respect to $6\frac{2}{3}$ shares only. He must have paid that one thousand dollars with respect to ten shares not included in this suit.

We assume that the supervisor did not include in this action the one hundred shares which stood in the names of the directors, because he had already collected seven thousand dollars with respect thereto. We have further gathered from the argument that no credit was given with respect to the assets turned over by the holding company, because the supervisor had arrived at the legal conclusion, which he now asserts, that those assets were in reality assets of the bank, and that they therefore could not be legally credited to superadded liability.

The defendants, appearing in groups, filed various motions and demurrers designed to raise questions of law, which were passed to the merits without waiver. They also answered in eight different groups. It is believed that the issues tendered will be sufficiently revealed in discussing the questions raised on appeal.

The trial resulted in a dismissal of the action. The trial judge rejected the substantive theory upon which the action was based. His reason for so doing is sufficiently indicated by the following excerpt from the memorandum opinion:

"Plaintiff here seeks to pierce the veil of the corporate entity of the Southwest Guaranty & Investment Company and reach its stockholders. This holding company, the court is satisfied from the evidence, is not a mere sham. It was not organized merely for the purpose of enabling its stockholders to participate in the earnings of the bank and avoid its liability."

The respondents, however, defended, not only upon that ground, but upon many additional grounds. It was contended that the superadded liability was actually fully discharged when the directors and the holding company responded to the demand made in February, 1933. In the alternative, it was urged that, having proceeded upon the theory of enforcing the liability against the record holders of the bank stock and having actually pressed that theory to the point of, at least, partial collection, irrevocable election was made.

It was further contended that the assessment and demands made on September 13, 1934, were wholly void, because excessive, since the assessment was for one hundred thousand dollars and the demands were for four times the amount which should have been made even on that assessment, and the assessment itself was excessive since considerable sums had already been collected with respect to superadded liability. In this connection, it is urged that seven defendant directors who paid on the original demand had been wholly discharged.

It is also contended that the plaintiff is estopped by his acts, particularly by the 1933 assessment and partial collection thereon, and by the act of his predecessors in office in urging and approving the original plan of organization. Various other specific contentions are made, but they are all subsidiary or dependent upon those above stated.

We think that all of the respondents' contentions may be dealt with by considering two questions: Could the

supervisor, in the first instance, have lawfully enforced the liability upon the theory which he is now pursuing? If that question be answered in the affirmative, did he do anything prior to September, 1934, which disabled him from beginning and maintaining the present action?

In resisting the theory upon which this action is predicated, the respondents contended that the holding company plan was adopted with the consent of the then supervisor of banking and in good faith, it being necessary to have someone to hold the two surplus buildings, and for other good reasons which we do not enumerate, since the trial court found that the consolidation plan was adopted in good faith, and we approve that finding. But, having so found, the trial judge dismissed the action, it evidently being his legal conclusion that the defendants could not be held unless the plan was adopted in bad faith, or, at least, unless the holding company was a "mere sham."

In our opinion, the question of motive is entirely immaterial; nor is it necessary, in order to permit a recovery in this case, to disregard the corporate entity of the holding company, or to invoke the comparatively modern concept of *alter ego,* or even to fall back upon considerations of public policy; for *the statute contemplates that the superadded liability shall be that of the real and beneficial owner of the stock.*

Our statute (Rem. Rev. Stat., § 3242) relating to superadded liability reads:

"The stockholders of every bank and trust company shall be individually and personally liable, . . ."

The Federal statute, formerly § 5151, Revised Statutes, now Title 12, U. S. C. A., § 63, reads:

"The shareholders of every national banking association shall be held individually responsible."

In a recent case, *Laurent v. Anderson,* 70 F. (2d) 819, decided by the sixth circuit court of appeals, it is said:

"To determine liability under section 64, the courts must disregard the forms of transactions and ascertain who is the real and beneficial holder of the stock. It has long been settled that the real and beneficial holder of bank stock is primarily liable for the double liability.

"The case of *Pauly v. State Loan & Trust Co.,* 165 U. S. 606, 17 S. Ct. 465, 41 L. Ed. 844, establishes the rule. In that case Mr. Justice Harlan reviewed all of the previous cases relating to the liability of shareholders, and one of the propositions announced was (page 619 of 165 U. S., 17 S. Ct. 465, 470): 'The real owner of the shares of the capital stock of a national banking association may, in every case, be treated as a shareholder within the meaning of section 5151 (now title 12, Sec. 63).' There never has been any departure from this rule. So lately as *Early v. Richardson,* 280 U. S., 496, 499, 50 S. Ct. 176, 177, 74 L. Ed. 575, 69 A. L. R. 658, it was said: 'That the actual owner of the stock may be held for the assessment, although his name does not appear upon the transfer books of the bank, is well settled'."

The amount of the liability is, in our statute (Rem. Rev. Stat., § 3242), fixed by the following words:

" . . . to the extent of the amount of their stock therein at the par value thereof, in addition to the amount invested in such shares. . . ."

In the *Pauly* case, which is said, in *Laurent v. Anderson, supra,* to have established the rule that the beneficial owner is primarily liable, the rule was arrived at, in part, by construing the words of the Federal statute fixing the amount of the liability, which words are identical with those from our own statute, just quoted. The court said, in part:

"And, let it be observed, the liability upon shareholders is to the extent of the amount of their stock at the par value thereof, 'in addition to the amount

*invested in* such shares.' The word 'invested' plainly has reference to those who originally or by subsequent purchase become the real owners of the stock, and cannot refer to those who never invested money in the shares, but only received the certificates of stock, or it may be the legal title thereto." *Pauly v. State Loan & Trust Co.,* 165 U. S. 606, 41 L. Ed. 844, 17 S. Ct. 465.

It seems perfectly clear to us that the defendants in this case, who were the stockholders in the three original banks, are the persons who "invested" in the shares of the new bank. It is equally clear that the holding company never invested any money or other tangible property. That the real consideration for the shares of the new bank came from the defendants, cannot be denied.

To the effect that the statute contemplates that the liability shall fall upon the real or beneficial owner, see Zollmann, Banks and Banking, § 1691, and cases cited in the footnotes to that section.

For cases where the apparent owner was a holding company, see *Barbour v. Thomas,* 7 Fed. Sup. 271, affirmed by circuit court of appeals, 86 F. (2d) 510; certiorari denied, 300 U. S. 670, 81 L. Ed. 877, 57 S. Ct. 513; *Fors v. Farrell,* 271 Mich. 358, 260 N. W. 886; *Corker v. Soper,* 53 F. (2d) 190; *Metropolitan Holding Co. v. Snyder,* 79 F. (2d) 263, 109 A. L. R. 912; and cases where the apparent ownership was in trustees, *O'Keefe v. Pearson,* 73 F. (2d) 673, 97 A. L. R. 1243; *Keyes v. American Life & Accident Ins. Co.,* 1 Fed. Sup. 512.

No space is available in this already too long opinion to discuss these cases. We should note, however, that we are aware of the fact that, in *Barbour v. Thomas, supra,* the charter of the holding company required its stockholders to assume liability on account of any bank stock which might be held by the company. But a careful reading of the opinions, both of the district

court and of the circuit court of appeals, convinces us that the same result would have been reached had there been no such requirement in the charter. In fact, both opinions treat the requirement only as "additional evidence" that the stock was beneficially held. This view of the *Barbour* case is also taken in a very recent case decided by the fourth circuit court of appeals, *Nettles v. Rhett,* 94 F. (2d) 42. The opinion in that case also concisely states the true rule governing the matter under discussion, and also the complete answer to the position taken by the trial court in this case. We quote from the opinion:

"Even in the absence of a prohibitory statute, *it has been quite generally held in recent bank cases under varying circumstances that the stockholders in a company, which holds for them the stock of a bank, are the real beneficial owners of the stock, and, as such, are subject to the assessment when the bank fails, notwithstanding the record ownership or title.* This is merely an application of the rule which, before the adoption of the holding company device in banking circles, had announced the liability of the real owner of bank stock, although not registered as such on the bank's books, *Pauly v. State Loan & Trust Co.,* 165 U. S. 606, 17 S. Ct. 465, 41 L. Ed. 844; *Ohio Valley National Bank v. Hulitt,* 204 U. S. 162, 27 S. Ct. 179, 51 L. Ed. 423; and *the rule has been recently applied, not only in cases in which an actual intent on the part of the organizers of the holding company to evade an impending statutory liability has been found to exist,* as in *Corker v. Soper,* 5 Cir., 53 F. 2d 190; *Durrance v. Collier,* 5 Cir., 81 F. 2d 4; *Brusselback v. Cago Corp.,* 2 Cir., 85 F. 2d 20; *Harris Investment Co. v. Hood,* 123 Fla. 598, 167 So. 25, *but also where the holding company was formed for the bona fide purpose of saving the bank or bringing about and controlling an expansion of its business, Metropolitan Holding Co. v. Snyder,* 8 Cir., 79 F. 2d 263, 103 A. L. R. 912; *Barbour v. Thomas,* 6 Cir., 86 F. 2d 510; *Fors v. Farrell,* 271 Mich. 358, 260 N. W. 886." (Italics ours.)

The trial judge did not have the benefit of this opinion, for it was handed down on January 4th of this year, more than a year after he rendered his memorandum decision.

The first question having been answered in the affirmative, it becomes necessary to deal with the second.

█ It is contended that the superadded liability was fully discharged by the payments made by the bank directors in the spring and summer of 1933, and by the transfers of property made by the holding company on March 29th of that year, and that therefore this action will not lie. It is true that the receipts given to the directors, or, at least, to some of them, recite: "Received . . . in payment of superadded liability." (Exhibit N) But the effect of the receipts must be controlled by the facts, and there is no doubt whatever that such receipts related to the ten qualifying shares held by each director, and to those only. If we have correctly analyzed the record, no recovery is sought in this action, with respect to those shares, either from the defendant directors or from anyone else.

As to the effect of the transfers by the holding company, we are not entirely in accord with either the appellant or the respondents. It is true that the minutes of a stockholders' meeting of the holding company show that it authorized the transfers in full payment of its superadded liability. But this is but self-serving. We find no evidence at all that the supervisor so accepted the transfers, and none that he ever asked or received permission from the court, which was supervising the litigation, to do so. Furthermore, as heretofore pointed out, the instruments transferring the bonds and building accounts (Exhibits J-1 and J-2) recite that the transfers are made in part payment of the superadded liability. It would not be expected that

the deed to the real property would contain such a recital.

During the trial, the appellant went so far as to contend, and now contends, that the deed was not taken in part payment of the liability, but was taken merely because the bank held mortgages on the buildings and the liquidator therefore thought it desirable to secure the title. Evidence was introduced to that effect, but it is not at all convincing, and must yield to the fact that indisputable circumstances, such as the demand upon the holding company and the recitals in the other instruments of transfer made the same date that the deed was executed, indicate that it also was taken in part payment. The effect which should be given to the payments by the directors and the transfers by the holding company, will be dealt with later in the opinion.

When the supervisor took over the bank for liquidation in February, 1933, one hundred of the one thousand shares of the bank stood in the names of its ten directors, and all the rest in the name of the holding company. It is clear that the supervisor knew all the facts, and it must be considered that he also knew the applicable law. Having a one hundred thousand dollar liability to collect, he asserted that it was due from the directors and the holding company and made demand upon them and accomplished a partial collection. In September, 1934, he concluded that the real obligors were the beneficial owners of the stock and brought this suit against them.

▮ The respondents contend that the first assessment and attempt to collect constituted an irrevocable election of remedy, and that this suit will therefore not lie. We think there is no merit in this contention. If A, having an obligation to collect, sues B and afterwards finds that it is C who is really liable and dismisses the suit against B and sues C, C cannot invoke

the doctrine of election to defeat the suit. If, however, A received a partial payment from B, at any rate if he received it out of funds belonging to C, C can successfully claim credit for it; for A is in no event entitled to actually receive and retain more than the rightful amount of his demand. But of that, later.

 It is also contended that the assessment of September 13, 1934, is void because the notices sent to the individual defendants demanded four times the amount than the maximum which could legally be demanded. We have hereinbefore shown that this occurred through errors as to the amount of bank stock beneficially owned by each of the stockholders. Since each of them must have known how much he owned, the mistake and the nature of it were apparent to each. The notice was exact as to the essential thing; that is, that each share owned would be assessed one hundred dollars. The record further shows that, in October, 1934, within a month after bringing of this action and nearly a year before it was tried, notices that Exhibit F would be amended were served upon defendants' counsel, together with a copy of the proposed amendment, although the original amendment was not formally offered to the court and filed until the beginning of the trial. We see no merit in the contention that the assessment was void on account of the mistake, or in the contention that the court erred in permitting the amendment.

 It is further contended, and with more reason, that the September, 1934, assessment is void because for the maximum amount, whereas a previous one hundred per cent assessment had been made and a considerable sum collected on that demand; citing *Korbly v. Springfield Institution for Savings,* 245 U. S. 330, 62 L. Ed. 326, 38 S. Ct. 88. It appears in that case that an assessment was made and partially paid. A

second assessment was made, in an amount larger than was required to raise the balance. Stockholders who had paid the original assessment contested the validity of the second. The court said baldly, and without giving any reason whatever:

"The second assessment must be held void because excessive. This, however, without prejudice to the making of another assessment by the Comptroller upon the shareholding banks for the difference, if needed, between the amount paid and the amount of an assessment for the full statutory liability."

At the beginning of this opinion, we took some pains to show that our statute lays down no procedural requirements. In *Hanson v. Soderberg,* 105 Wash. 255, 177 Pac. 827, it was held that our statute gives the examiner (now the supervisor) the power to determine the necessity for an assessment. The opinion also approved the steps the examiner had taken in that case in making an assessment, followed by demand and notice, pointing out that the Federal authorities followed this procedure under a similar statute; but it did not hold anything more than that a determination of necessity was required. No procedural requirements beyond the actual determination of necessity are prescribed either by statute or decision, and we are therefore wholly free to approve any procedure which is in accordance with due process and consistent with the orderly administration of justice.

The *Korbly* case may, perhaps, be distinguished from the case at bar on the ground that in this case nothing was previously assessed against or demanded from the present defendants, other than the defendant directors; and that demand and collection were with reference to stock as to which no recovery is here sought. But if it cannot be distinguished, we are not disposed to follow it because we see no good reason why an

assessment and demand which is excessive should be considered wholly void and ineffective, nor why in an equitable action the plaintiff should be required to do so vain a thing as to dismiss and start all over again because there has been an irregularity in fixing the amount which he might rightfully demand. We do not think the fact that the appellant made two assessments, so long as he claimed no right to collect more than one hundred thousand dollars, in any event deprived the respondents of any substantial rights.

It is further contended that the appellant is estopped to maintain the action because the whole scheme of the consolidation of the three banks and the creation of the holding company, and the use to be made of it, was approved, permitted, and encouraged by the appellant's predecessor in office. We think it clear that the constitutional rights granted to creditors of state banks cannot be limited or destroyed by any voluntary act of the supervisor of banking. He is a mere statutory agent and, obviously, has no power to directly or indirectly absolve anyone from the operation of the constitutional provision.

This being an action in equity and before us *de novo*, it is the duty of this court, in so far as the record will permit, to settle the rights of all the parties to the action. The appellant insists, with much force and considerable plausibility, that all the property which he received from the holding company in March, 1933, was, in fact and in law, the property of the bank. He further contends that, even if he did take it as part payment of superadded liability, that act was never approved or ratified by the court, and that we should now hold that the bank at all times had the right to the property as its own.

This is to completely disregard the holding company as a legal entity. We do not think that this can

rightly be done. If the property of the three old banks was more than ample to support the capitalization of the new bank, and there is no evidence that this was not the case, we see no legal reason why the stockholders of the old banks, in carrying out the consolidation plan, could not legally lodge the surplus property in another corporation.

The defendants in this suit owned the entire twelve thousand shares of the holding company, in the same proportion as they beneficially owned the stock of the new bank. Equitably, the property of the holding company belonged to them. The plaintiff took it out of the hands of the holding company on March 29, 1933, on the ground that he was collecting superadded liability, and he still holds it, although claiming not to have taken it for that purpose. It seems apparent that the supervisor should not be allowed to retain this property, which equitably belonged to the defendants, and at the same time recover a one hundred per cent assessment against them in this action. But more than five years have elapsed since the property was taken, and the parties cannot, at this late date, be placed in the position which they were then in by returning the property *in specie.*

The fact that seven of the defendants each paid the supervisor one thousand dollars with respect to the ten shares, qualifying him as a director, presents a further problem. As we have hereinbefore pointed out, there are statements in the brief, supported by detached and incidental bits of evidence, which indicate that the beneficial ownership of these shares was regarded as being in the holding company. There was no issue joined or tried out as to this matter, and we are unwilling to find this to be a fact on such scanty evidence as appears in the record, especially since to do so would involve reaching the conclusion that the

shareholders, the directors, and even the supervisor of banking who approved the details of the consolidation, connived to disregard the plain requirements of § 30, chapter 80, Laws of 1917, p. 287, Rem. Rev. Stat., § 3237 [P. C. § 280]. We quote a portion of this section:

"Every director must be the beneficial owner of at least ten shares of stock, excepting that a director of a bank having a capital stock of $50,000 or less, need be the owner of only five shares of stock."

If, however, the property taken from the holding company be applied on the one hundred thousand dollar assessment, thus making the assessment recoverable per share less than one hundred dollars, then the sum the directors have paid with respect to their qualifying shares is more than they should have paid, and they are entitled to some kind of a credit.

In our opinion, this case may be best disposed of, and in a way that will lawfully guard, enforce, and protect the rights of all the parties, by remanding it to the trial court, with directions to determine the value of the property conveyed by the holding company to the supervisor on or about March 29, 1933, and as of the date of transfer, that is, the value of the buildings, furniture and fixtures, bonds, building accounts, and other property, if any; with the further direction that, when such value has been ascertained, the amount which the holding company owed the bank on the date of transfer shall be deducted therefrom. The balance so found will be credited on the one hundred thousand dollar assessment and, when deducted from one hundred thousand dollars, will fix the amount which the supervisor will be entitled to recover in this action, and that amount, when divided by one thousand, will fix the amount which he is entitled to

recover as to each share. of stock beneficially owned by each of the defendants.

In fixing the individual amounts recoverable from the defendants, the court will, in the case of the defendant directors, make the same assessment with reference to their qualifying shares, for which they subscribed, as is made with reference to the shares they beneficially owned by virtue of ownership of stock in the holding company; and, in fixing the amount recoverable from defendants Agnew, Wonderly, Raught, Gesler, Proffitt, C. D. Gingrich, and Albert Smith, the court will allow each of them credit for one thousand dollars, each of them having heretofore paid that amount to the supervisor; and, if in any instance the credit so allowed a defendant exceeds the amount found recoverable from him in this action, the court will enter judgment in the appropriate amount in favor of such defendant or defendants and against the plaintiff.

Since there appears to be quite complete evidence in the record as to the value of the property involved and as of the date of transfer, it may be that the directions above given can be carried out without taking additional evidence. That matter, however, should be, and is, left to the trial court's discretion.

The judgment appealed from is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

STEINERT, C. J., BEALS, BLAKE, and MILLARD, JJ., concur.