### TUTTLE v. UNITED STATES.
No. 49300.

United States Court of Claims.
Dec. 4, 1951.

George L. Morris, Jr., Detroit, Mich., for the plaintiff. Walter F. Kramer, Detroit, Mich., was on the briefs.

J. W. Hussey, Washington, D. C., with whom was Asst. Atty. Gen. Theron Lamar Caudle, for the defendant. Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

This is a suit for refund of income taxes paid by the plaintiff. It involves two transactions which will be discussed separately.

The Weber Oil Company Transaction

On September 30, 1941, the plaintiff owned, and had owned for several years, 150

shares of stock of the Weber Oil Company, a corporation. On that day he and all the other stockholders of that company sold their stock to The Ohio Oil Company. There were, in all, 3,125 shares of such stock. The consideration for the sale of all the stock was $1,500,000 in cash; $1,000,000 to be paid within twelve months; an "oil payment" of one-eighth of gross proceeds of oil produced and marketed from certain designated existing leases of the Weber company until such payments totaled $2,000,000; and a one-sixteenth over-riding royalty from gross proceeds from oil produced and marketed from the same designated leases for an unlimited time and in an unlimited amount.

The contract of sale provided that The Ohio Oil Company, the purchaser of the stock, would dissolve the Weber Oil Company, and would make the promised payments to an agent of the stockholders, to be by him distributed to them in the proportions to which the stock which they had owned and sold entitled them.

The plaintiff made a large profit on the sale of the stock and paid income tax for 1941 at capital gains rates on the profit included in the cash which he actually received in that year, and on the estimated future receipts from the one-eighth oil payment, the latter amounts being discounted 25 percent because they were to be received in the future.

In each of the years 1942 to 1945 the plaintiff received payments under the one-eighth oil payment provisions of the contract of sale, which payments were in excess of the estimated future payments which he had included in his 1941 return. His contention in this suit is that these receipts were capital gains, and taxable only as such. The Government contends that they were ordinary income flowing to the plaintiff because he owned an interest in producing oil wells, and that the receipts were taxable as ordinary income, subject to the depletion allowance which is permitted to an oil producer by the tax statutes.

In Haynes v. United States, 50 F.Supp. 238, 100 Ct.Cl. 43, we considered a problem substantially identical with the instant one and concluded that the receipts there involved were capital gains and not ordinary income. Our reasons were stated there and will not be repeated here. The Government calls our attention to a provision of the contract in the instant case which, it says, shows that the plaintiff and the other Weber Oil stockholders were intended to have a property interest in the oil wells. In that provision The Ohio Oil Company says that, after the dissolution of the Weber company, "it will assign to the Bay Trust Company, as agent for the stockholders of the Weber Oil Company and for said Alvin H. Weber, and subject to the terms and conditions of this contract, said oil payments and overriding royalty, * * *." We think that, in its context, this provision meant only that The Ohio Oil Company would furnish this agent with evidence as to what the future payments were to be and would make the payments to it as they became due.

The further provision of the contract that if the Ohio company proposed to abandon a lease, it should notify the stockholders and give them an opportunity to buy the equipment which it had on the lease was no more than an agreement for a possible future sale, and did not affect the nature of the principal transaction, or show that the stockholders had a present property interest in the leases.

### The Guardian Depositors Corporation Issue

In 1933 the plaintiff owned 2,020 shares of Guardian Detroit Union Group, Inc. stock for which he had paid $145,945.72. This corporation was a holding corporation, whose assets were stocks of national and state banks. It owned all the stock of Guardian National Bank of Commerce of Detroit, and five lesser national banks in Michigan. All these banks were closed on February 11, 1933, when the Governor of Michigan proclaimed a "bank holiday." The United States Comptroller of the Currency appointed receivers and, in 1933, declared the banks insolvent. Within the year 1933 the creditors and depositors

of the Guardian National Bank were paid 68 percent of their claims.

The receivers of the six national banks contended that, for the purposes of the statute imposing a 100 percent liability on stockholders of national banks, if necessary to pay the banks' debts, the stockholders of Guardian Group, though they were not stockholders of the banks, but only of the holding company which was the sole stockholder of the banks, should be treated as stockholders of the banks. The stockholders of Guardian Group disputed this liability but lost their case in the United States District Court in Michigan. They appealed to the United States Court of Appeals for the Sixth Circuit, but while the appeal was pending, a settlement agreement was worked out for the liquidation of the banks "in view of the litigation uncertainties." This settlement was a Plan of Liquidation developed by a Guardian Bank Depositors Committee, a committee of stockholders of Guardian Group, Inc., and the United States Comptroller of the Currency. The plan was formally adopted, with the approval of the court, on April 29, 1935. Under the plan a corporation named Guardian Depositors Corporation was formed.

Under the plan the individual stockholders of Guardian Group agreed to raise $5,040,000 to be paid to the receivers of the six banks, that being the amount estimated to be necessary to pay the debts of the banks. Each stockholder in Guardian Group, Inc., was authorized to subscribe to the capital stock of the liquidating corporation, Guardian Depositors Corporation, in proportion to his stockholding in Guardian Group, Inc. In return for their payment of $5,040,000, each stockholder of Guardian Group was to receive a settlement fund certificate for the proportionate amount which he contributed to the $5,040,-000 payment. The plaintiff and some other stockholders of Guardian Group, Inc., did not subscribe to the capital stock of the Depositors Corporation. The plaintiff did contribute $14,907.60 to the $5,040,000 fund, and received a settlement fund certificate for that amount. That certificate provided that, so far as concerned the 78.808 percent

($4,000,000) of the $5,040,000 fund which was turned over to the Guardian Bank, the certificate holder would get back that percentage of his contribution, with interest at 5 percent, if the assets of Guardian Bank could be successfully liquidated. Under the liquidating plan, after (1) all depositors and creditors of the banks had been paid; (2) the subscribers to the capital stock of the liquidating corporation had been paid; (3) the holders of the settlement fund certificates had been paid; the remaining assets, if any, were to be turned over to a trustee for the stockholders of Guardian Group, Inc. Some $2,000,000 to $3,000,-000 was so turned over to the trustee.

Upon his settlement fund certificate for $14,907.60, the plaintiff was paid various amounts on the principal in 1942 and 1944, and $4,988.44 in interest in 1944. Including the interest, he got back more than the amount which he had contributed to the settlement fund.

Going back now to 1933, the year that the banks were declared insolvent, the plaintiff in his income tax return for that year claimed, among other deductions, a deduction of $145,945.72 because his Guardian Group stock which had cost him that sum had become worthless in that year. He also claimed a deduction of $1,018.05 which he paid that year toward the settlement of the stockholders liability asserted against him. These deductions much more than cancelled his net income, which would have been $52,716.37 but for the deductions. As to more than $90,000 of the deductions he did not, then, receive any tax benefit.

In 1934 the plaintiff in his return deducted $15,890.47, the amount he paid into the settlement fund that year. The discrepancy between this amount, plus the $1,018.05 which he had paid in 1933, on the one hand, and the $14,907.60 shown on his settlement fund certificate, is accounted for by certain equalization payments not here relevant. The plaintiff's 1934 income, except for the deduction of $15,890.47, was larger than that sum, hence he received full tax benefit from that deduction.

In his income tax return for 1942, the plaintiff reported as ordinary income the $1,490.76 which he was paid on his settle-

ment fund certificate in that year. In his return for 1944 he similarly returned the $10,257.77 so received as principal, and the $4,988.34 received as interest during that year. He filed timely claims for refund of these amounts. His primary ground for recovery is that these payments to him in 1942 and 1944 were a partial return of capital lost by him in 1933 when his Guardian Group stock became worthless, involving a loss deductible from income of $145,945.72. He showed this loss on his return for 1933 but got no tax benefit from most of it because, as we have seen, it so far exceeded his income for that year.

The plaintiff relies upon the "tax benefit" doctrine as stated in Section 22(b) (12) (D) of the Internal Revenue Code, inserted by the Revenue Act of 1942, 26 U.S. C.A. § 22(b) (12) (D). That section says that recovery of bad debts, prior taxes, and delinquency amounts should be excluded from gross income to the extent to which the deductions allowed on such transactions had not resulted in a reduction of the taxpayer's income tax. The Supreme Court of the United States, in Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, held that such a doctrine had been extant before the 1942 congressional enactment, and that the statute did not restrict its application to only the three kinds of losses named in the statute. Following the Dobson decision, on May 10, 1945, the Commissioner of Internal Revenue issued T.D. 5454 which expressly extended the applicability of the tax benefit doctrine of the statute to "all other losses, expenditures * * * made the basis of deductions from gross income for prior taxable years" with certain exceptions not here relevant. The legal force of this Treasury Decision is not contested by the Government.

It seems to be settled that the payment of an assessment on bank stock is an additional capital cost of the stock. Porter Property Trustees, Ltd., 42 B.T.A. 681, 682; Mertens, Law of Federal Income Taxation, Section 28:42. The Bureau of Internal Revenue has taken this position. See First National Bank in Wichita v. Commissioner, 10 Cir., 46 F.2d 283, 284. If, then, the plaintiff had owned stock of the national banks themselves, and had been assessed thereon, his payment of his assessment would have been an additional cost of his stock and not a loss deductible from current income. Here the plaintiff did not directly own stock in the national banks, but the stock which he did own in the holding company was treated by the Government's Comptroller of the Currency, for the purpose of assessment, as if it had been stock in the national banks. This treatment was legally correct. Anderson, Receiver v. Abbott, Adm'x, 321 U.S. 349, 357, 64 S.Ct. 531, 88 L.Ed. 793. See also Lucking v. United States, 102 Ct.Cl. 233, 240. Since the law treated the plaintiff as the owner of national bank stock for assessment purposes, we think that with equal recognition of the realities of the situation it should so treat him for the purpose of the tax benefit doctrine.

■ The plaintiff owned stock in Guardian Group, a holding company of national bank stock. Because he owned this stock, and solely because he owned it, he was assessed, when the national banks became insolvent. He compromised his liability by contributing to the settlement fund, for the payment of the creditors of the banks, and for ultimate return to himself, if the liquidation of the banks left something for that purpose. His parting with it, and his getting back of some of it, was an actual and legal consequence of his owning the stock in Guardian Group. We think it was all a part of one transaction. He should, therefore, be allowed to count up the original cost of his stock, add to that his assessment, deduct from the sum the amounts by which he had tax benefits in 1933 and 1934, and still recover, without liability for income taxes, the difference. Since his recoveries of principal on his settlement fund certificate in 1942 and 1944 were much less than this difference, we think he should not have been taxed upon these amounts as income.

In the 1944 payments on the settlement fund certificates was a payment of $4,988.-34, which was designated as interest on his contribution to the settlement fund. The liquidation agreement provided for the pay-

ment of 5 percent interest on the contributions, if funds were available for its payment. The payment was computed as interest, and we see no reason why it was not interest. It was, therefore, taxable as ordinary income.

The plaintiff is entitled to recover. Entry of judgment will be suspended to await the filing of a stipulation by the parties showing the amount due, in conformity with our findings and opinion, together with interest as provided by law.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.