ESTATE OF FRED T. MURPHY, DECEASED, DETROIT TRUST COMPANY AND EDWARD S. REID, JR., EXECUTORS, AND MARY E. MURPHY, SURVIVING WIFE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 37135–37141. Filed May 6, 1954.

---

[1] Proceedings of the following petitioners are consolidated herewith: Mary E. Murphy; Frederick M. Alger, Jr., and Suzette Dewey Alger, his wife; Frances Alger Boyer; Frederick M. Alger, Jr.; Harold R. Boyer and Frances Alger Boyer, his wife.

*Edward S. Reid, Jr., Esq.*, and *Berrien C. Eaton, Jr., Esq.*, for the petitioners.

*Charles R. Hembree, Esq.*, for the respondent.

250

WITHEY, *Judge:* While the record herein does not expressly show that Detroit Bankers was dissolved in 1933 and at the time of dissolution had no substantial assets, other than its bank stocks, the findings of the court in *Barbour* v. *Thomas*, 7 F. Supp. 271, affd. 86 F. 2d 510, certiorari denied 300 U. S. 670, in which the stockholders of Detroit Bankers were held proportionately liable for the assessment made on First National stock, are to that effect. In view of this, and since the parties have presented the instant proceedings on that theory, we will proceed upon such theory in determining the issues herein.

The parties have stipulated that at the time Detroit Bankers failed and was placed in receivership it owned substantially all the stock of several national banks besides that of First National; that certain additional assessments were levied and paid with respect to the stock of those other national banks; that such assessments are not included in the assessments paid on the particular shares of First National involved herein; and are not involved in the instant proceedings. The record is silent as to any deductions taken by petitioners with respect to assessments paid by them on the stock of the other banks, or any tax benefits derived therefrom, or any recoveries received with respect to such payments, or what was the final result to Detroit Bankers, or the petitioners, as to the receiverships of the other banks. The parties make no arguments with respect to any of such matters. In view of this situation we construe the stipulation of the parties to mean that in determining the issues here involved none of the matters relating to the stocks of the other banks, if considered, would produce a result different from what would be reached by considering the First National stock as the only stock owned by Detroit Bankers for the assessment payments, tax benefits, and amounts received with respect to such assessment payments relative to the First National stock, as being the only relevant items of such character. Such a construction will be observed in determining the questions before us.

These proceedings present the question of whether the petitioners realized income during the years in controversy as a result of the distributions received by them with respect to assessments on the First National stock which had been paid in prior years. The assessments paid and the ownership of Detroit Bankers stock may be classified into four groups. Each group will be considered separately.

1. *Assessments paid by Mary E. Murphy and Frederick M. Alger, Jr., and distributions made to them.*

At the commencement of the Michigan "bank holiday" in February 1933, Mary E. Murphy owned 2,000 shares of Detroit Bankers stock which had cost her $73,864.71. At the same time Frederick M. Alger, Jr., owned 180 shares of Detroit Bankers stock which had cost him $3,960. Earlier in February 1933 he had sold 120 shares of Detroit Bankers stock which had cost him $2,640 and sustained a loss thereon of $1,316.96. Although the sale was made prior to the "bank holiday" actual transfer of the stock had not been effected on Detroit Bankers records when the holiday commenced. In the joint income tax return for 1933 filed by Mary E. Murphy and her then husband, Frederick M. Alger, Sr., she deducted as a loss the cost of the stock owned by her. In his return for 1933 Frederick M. Alger, Jr., de-

ducted as a loss the cost of his 180 shares. He also deducted the loss sustained on the sale of the 120 shares. In 1937, in connection with her ownership of 2,000 shares in Detroit Bankers, and on account of the stock in First National held by Detroit Bankers, Mary E. Murphy paid an assessment of $28,111.55. In the same year Frederick M. Alger, Jr., made a like payment in the amount of $2,530.03 in connection with his ownership of 180 shares in Detroit Bankers, and a like payment of $1,686.69 with respect to the 120 shares in Detroit Bankers which he sold prior to the "bank holiday." In their income tax returns for 1937 they deducted their respective payments. They derived no tax benefit from the deductions taken in their returns for 1933 as losses sustained in that year on Detroit Bankers stock. However, they derived full tax benefit from the deductions in their returns for 1937 on account of the assessments paid in that year on the First National stock. In each of the years 1946 and 1948 they received distributions amounting to 25 per cent of the amount of the assessments paid in 1937, and in 1949 they received final distributions amounting to 36 per cent of the amount of their assessment payments.

The petitioners take the position that the assessments paid by them in 1937 on the First National stock constituted additional costs of their stock in Detroit Bankers and should be added to the original cost to arrive at the total cost basis of such stock. They contend that since no tax benefit was derived from the deductions taken in 1933 for the original cost of their Detroit Bankers stock but full tax benefit was derived from the deductions taken in 1937 for the assessments paid in that year, the total cost basis is to be reduced by the amount of such payments; that against such remaining cost basis are to be offset the distributions received in 1946, 1948, and 1949 with respect to the assessments paid on the First National stock; that when this is done it will be found that when the final distribution was made in 1949 they had not received full tax benefit of the total cost basis of their Detroit Bankers stock; and that accordingly they realized no income in 1946, 1948, and 1949 from the distributions received in those years. The respondent contends that the Detroit Bankers stock having become worthless in 1933, the petitioners then sustained losses of their investments in that stock; that in view of this, and since they deducted such losses in their income tax returns for that year, their transactions in the stock, therefore, were completed in 1933; that when the petitioners paid the assessments in 1937 they were not making additional capital investments but making payments of their personal liability which constituted separate transactions resulting in separate deductible losses; and that since full tax benefits were derived from the payments, the distributions received with respect thereto constituted ordinary income.

The primary question is as to how the assessments are to be regarded for the purpose of determining the tax treatment to be accorded the distributions. By their contentions the petitioners are asking that the series of transactions beginning with the acquisition of their stock in Detroit Bankers and ending with the receipt in 1949 of the final distribution in liquidation of assets of First National be regarded as a whole. The respondent is asking us to hold that all transactions relating to the stock ended with the stock becoming worthless in 1933 and the petitioners deducting the cost thereof as losses in their income tax returns for that year, and to hold further that the payment of the assessments and the receipt of the distributions fall in a separate and different category to what he contends are transactions relating to the stock.

It was by reason of their ownership, and solely by reason of such ownership, of stock in Detroit Bankers that the petitioners were required to pay their proportional parts of the assessment made on the First National stock. Their liability for payment had become fixed and could not be avoided. As a result of their discharge of the liability by payment, and as a result of their continued ownership of the Detroit Bankers stock, they were entitled to receive their pro rata portions of whatever sums might become available from the liquidation of the assets of First National. With such a direct relationship existing throughout the entire series of transactions, and since we are here called upon to make a determination as to the last of them, it appears only proper to regard the series of transactions as a whole. To so regard them is no more a breach of the well established principle that each taxable year is a separate unit for tax accounting purposes than was the case in *Dobson* v. *Commissioner*, 320 U. S. 489, affirming 46 B. T. A. 770, where, for the purpose of determining whether the taxpayer realized income in 1939 upon the receipt of certain sums received in final settlement of a controversy respecting his rights as to stock purchased in 1929 and thereafter sold, the series of transactions from 1929 to 1939 were regarded as a whole; or was the case in *Arrowsmith* v. *Commissioner*, 344 U. S. 6, where, for the purpose of determining the nature of a loss sustained in 1944 by a transferee stockholder in the discharge of a liability of a completely liquidated corporation, the entire series of transactions from the beginning of the liquidation of the corporation in 1937 until the discharge of the liability in 1944 was considered.

In *Adam, Meldrum & Anderson Co.*, 19 T. C. 1130 (on appeal, C. A. 2), the taxpayer, under a compromise settlement and in discharge of a liability arising from its statutory liability as a stockholder in a

State bank whose capital had become impaired, made payment of approximately $137,000. Prior to the time the taxpayer became liable for the payment, its shares of stock in the bank, in accordance with law, had been canceled and thereupon become null and void for all purposes and the taxpayer's rights therein had ceased. The question presented was whether the amount of the payment was deductible as a business expense or loss or should be capitalized as an additional cost of the shares the taxpayer had owned in the bank. Respecting the general rule as to the treatment to be accorded bank stock assessments, it was said:

> We think it must now be accepted as settled law that the so-called double liability assessment which is placed by law on the owners of bank stock must be treated as an additional cost of the stock to the stockholder, *First Nat. Bank in Wichita* v. *Commissioner*, 46 F. 2d 283, affirming 16 B. T. A. 1399; *Porter Property Trustees, Ltd.*, 42 B. T. A. 681, affirmed without discussion of this point, 130 F. 2d 276; Regulations 111, sec. 29.24–2; see also *B. Estes Vaughan*, 17 B. T. A. 620; S. M. 4510, IV–2 C. B. 185. * * *

However, since no formal assessment had been made, the shares had been canceled and become null and void for all purposes and worthless, and the taxpayer's rights in the shares had ceased, we concluded that the general rule as stated above was inapplicable and that the amount of the payment made by the taxpayer was deductible as an ordinary loss. While certain language used in reaching that conclusion might seem to imply that even though a stockholder continues to own his shares an assessment paid thereon is not in anywise to be regarded as an additional cost of the shares unless the shares continue to have value, such language is to be considered as relating only to the peculiar and unique factual situation there presented and is not to be construed as applying broadly to other situations not there involved.

Unlike the situation in *Adam, Meldrum & Anderson Co., supra*, the stock of the petitioners in Detroit Bankers, at the time of the payment of the assessments thereon, had not been canceled and become null and void with a consequent cessation of the rights of the petitioners therein. They continued to own the stock with all rights therein not only at the time the assessments were paid but also when the distributions were made in 1946, 1948, and 1949. Although the stock does not appear to have had any value at the time the assessments were paid, that alone does not preclude them from being regarded as additional cost of the stock for present purposes.

In *George H. Stanton*, 36 B. T. A. 112, the taxpayer was the controlling stockholder in two banks which closed in 1923. Because of his liability as a stockholder and officer of the banks to depositors, he

placed some of his own property in trust under an agreement which provided that it could be used with his consent prior to the end of a 5-year period to pay the creditors of the banks in the event liquidation of the assets of the banks proved insufficient to pay claims in full. In 1929 the trustees used some of the property to pay creditors. In holding that the taxpayer was entitled to take a deduction in 1929 on account of the property so used, it was said:

> The property in question was used by the trustees with his [petitioner's] consent in 1929, prior to the end of the five-year period. Its use then was a continuation of the transactions originally entered into for profit when the petitioner acquired the stock of the two banks. Such use in 1929 was the equivalent of the payment by the petitioner of additional amounts as cost of his bank stock. The bank stock was already worthless. These additional payments were lost as soon as they were made. * * *

In *Henry Adamson*, 17 B. T. A. 17, the taxpayers owned certain corporate stock which was found to be worthless in 1922. In 1922 and 1923 they paid assessments levied on their stock during those years. In holding that the assessments were deductible in the years of payment, it was said:

> While such assessments represented additional cost of the stock, they were also only additional losses, as the stock had then become worthless. *J. G. Paxton*, 7 B. T. A. 92.

From the statements in the *Stanton* and *Adamson* cases, it is apparent that even though the assessment payments were held to be deductible losses, they were regarded as additional costs of the stock.

In *Tuttle* v. *United States*, 122 Ct. Cl. 1, 101 F. Supp. 532, the taxpayer owned stock in a corporation whose assets were stocks of national and State banks. Certain of the banks closed and the receivers sought to collect from the stockholders of the holding corporation the statutory liability of stockholders in the closed banks. Litigation arose and under a plan of settlement the taxpayer compromised his liability by payment of a stated sum into a settlement fund under an arrangement that he was to receive back a portion of his payment if the liquidation of the banks left something for that purpose. In determining whether distributions received by the taxpayer upon liquidation of the banks constituted income, the court held that the payment into the settlement fund was an additional cost of the taxpayer's stock in the holding corporation.

Under the holdings in the foregoing cases, we think if the petitioners had directly owned the stock in First National on which the assessments were paid, the payments would have been an additional cost of their stock. However, it was by reason of their ownership of stock in Detroit Bankers, which in turn directly owned stock in

First National, that they were liable for the assessments. In view of this and of what has been said above, we hold that for present purposes the assessments paid by petitioners are to be regarded as additional cost to them for their stock in Detroit Bankers.

Under the tax benefit rule, which the petitioners ask to have applied here, where there is recovery in respect of a loss sustained in an earlier year and a deduction of such loss claimed and allowed for the earlier year has effected an offset in taxable income, the amount recovered in the later year should be included in taxable income for the year of recovery. The reason for this is that even though the subsequent recovery is in the nature of a capital recovery, the prior deduction of the amount of the loss from taxable income has for income tax purposes already given the taxpayer a recoupment of such loss out of taxable income and the subsequent recovery, being in the nature of a replacement of taxable income, is the equivalent of gain to the taxpayer. But where the deduction claimed and allowed in the prior year did not effect an offset of taxable income, the amount recovered in the later year does not constitute taxable income for the year of recovery.

Since the assessments paid by the petitioners in 1937 on the First National stock constituted a portion of the total cost to them of the Detroit Bankers stock, and since they derived full tax benefit from the deduction of such payments in their 1937 income tax returns, the distributions received during the years 1946, 1948, and 1949 are to be applied in reduction of the total cost of their Detroit Bankers stock. Inasmuch as the petitioners derived no tax benefit from the deduction of the original cost of their Detroit Bankers stock in their income tax returns for 1933, and as the distributions received with respect to the assessment payments on the First National stock amounted to only 86 per cent of such payments, it is apparent that when they received the final distribution in 1949 there remained a substantial portion of their cost basis which had not effected an offset in taxable income. Accordingly, we conclude that the petitioners received no income from the receipt of the distributions.

The petitioners concede on brief that of the distributions received by Frederick M. Alger, Jr., in 1949, $133.59 represented gain with respect to the 120 shares of Detroit Bankers stock sold by him in February 1933. This gain arises from the tax benefit he derived from the deduction and allowance in his 1937 return of the assessment paid in that year with respect to such shares. Although conceding the gain and the amount thereof, the petitioners contend that it was capital gain. The shares in question were capital assets and had been sold at a loss in 1933. As a consequence, the loss was a capital loss.

If the assessment had been paid in 1933 when it was levied instead of in 1937, it would have constituted part of the capital loss sustained on the stock in 1933. However, the fact that the payment was not made until 1937, for which year it was allowed as an ordinary loss, in nowise changed its character from that of a capital loss. *Arrowsmith* v. *Commissioner, supra.* Since the loss arising from the payment was a capital loss when sustained, the gain in question was capital gain.

2. *Assessments paid by the Estate of Frederick M. Alger, Sr., on shares owned by Frederick M. Alger, Sr., and his two grand-daughters; distributions made to Mary E. Murphy, Frederick M. Alger, Jr., and Frances Alger Boyer.*

During 1933 Frederick M. Alger, Sr., owned and held in his name 7,185 shares of stock in Detroit Bankers. He died on December 31, 1933, and in the joint income tax return filed for 1933 for him, and his wife during that year, Mary E. Murphy, the cost of the shares was deducted as a loss but no tax benefit was obtained therefrom. At the death of Frederick M. Alger, Sr., the above shares passed to his estate along with a liability of $14.055775 per share for the assessment on the stock of First National. In addition, the estate became similarly liable for assessments on account of 72 and 80 shares of Detroit Bankers stock which prior to 1933 Frederick M. Alger, Sr., had transferred to his granddaughters, Suzette deM. Alger and Frances Alger Boyer, respectively. In the estate tax return filed for the estate of Frederick M. Alger, Sr., the 7,185 shares of Detroit Bankers stock were valued at zero and deductions were taken and allowed as debts of the decedent on account of the assessment liability with respect to the above 7,185, 72, and 80 shares, respectively. In 1936 and 1937 the executors of the estate used funds of the estate to pay said assessment liability but took no deduction therefor in the income tax returns of the estate for either of those years. Thereafter upon a distribution of the residue of the estate of Frederick M. Alger, Sr., pursuant to will, there were distributed to Mary E. Murphy, Frederick M. Alger, Jr., and Frances Alger Boyer, in the proportions of one-half, one-fourth, and one-fourth, respectively, among other things, the 7,185 shares of Detroit Bankers stock and any rights which the estate might have in respect of any assessment payments made by it.

The petitioners make several contentions as to why the distributions received by them were not income to them. The respondent makes various contentions in support of his determination that the distributions were income. However, as a result of the view taken below, it

becomes unnecessary to give detailed consideration herein to the various contentions of the respective parties.

Where one acquires property by bequest, devise, or inheritance, its basis in his hands is its fair market value at the time he acquired it.[2] The time of acquisition is the time of death of his decedent. *Malcolm Clifton Davenport*, 6 T. C. 62. However, if the property is an investment by the fiduciary under a will, the cost or other basis to the fiduciary is to be taken instead of fair market value at the time of death of the decedent. Regs. 111, sec. 29.113 (a) (5)–1 (*d*). We have held above that assessments paid on First National stock by the stockholders of Detroit Bankers constituted an additional cost to them of their stock in the latter corporation. Applying that holding here, we think that when the executors of the estate of Frederick M. Alger, Sr., made payment of the assessments on First National stock with respect to which the estate was liable, they made an investment in Detroit Bankers stock. Detroit Bankers stock had no fair market value at the time of the death of Frederick M. Alger, Sr., and its basis in the hands of the petitioners therefore would have been zero. But when the executors made an investment therein, the amount of such investment became its basis to the petitioners. Since the total distributions received during the years 1946, 1948, and 1949 amounted to less than the assessments paid, it is apparent that the petitioners did not realize any income from the distributions.

*3. Assessment paid by Irene S. Moffatt; shares passed by will to Mary E. Murphy and distributions paid to her.*

On July 4, 1944, Irene S. Moffatt died owning 667 shares of Detroit Bankers stock. With respect to this stock, she had paid an assessment of $9,375.20 on First National stock which she deducted in her income tax return for the year of payment and derived full tax benefit therefrom. Under the residuary portion of her will, said shares of Detroit Bankers stock, together with all rights respecting the assessment paid on First National stock, passed to Mary E. Murphy and were valued for Federal estate tax purposes at $500.25. The parties have agreed that that amount was the basis of such stock and rights in the hands of Mary E. Murphy.

---

[2] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

    \*        \*        \*        \*        \*        \*        \*

(5) PROPERTY TRANSMITTED AT DEATH.—If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. \* \* \*

The petitioners contend that all the distributions in excess of $500.25 received by Mary E. Murphy, with respect to the assessment on First National stock paid by Irene S. Moffatt on account of her ownership of 667 shares of Detroit Bankers stock, constituted capital gain and not ordinary income.

To constitute capital gain within the provisions of the Internal Revenue Code, a gain must arise from the sale or exchange of a capital asset. Sec. 117 of the Code; *Hale* v. *Helvering*, 85 F. 2d 819. The words "sale" and "exchange" are to be given their ordinary meaning, except in those situations which, but for applicable statutory enactment, would fall outside such ordinarily accepted meaning. *Helvering* v. *Flaccus Oak Leather Co.*, 313 U. S. 247.

Under the facts presented and under the ordinary meaning of the words "sale" and "exchange," Mary E. Murphy never sold or exchanged her 667 shares of stock in Detroit Bankers or the rights to the distributions made with respect to the assessment paid on First National stock on account of said shares. However, section 115 (c) of the Code [3] provides that amounts distributed in liquidation of a corporation are to be treated as in payment in exchange for the stock. The question here is whether the distributions in controversy come within that provision of the Code. Concededly, the distributions were received by Mary E. Murphy from First Liquidating Corporation. But that corporation was organized solely for the purpose of taking over and liquidating certain unliquidated assets of First National. The distributions in controversy came from the proceeds of such liquidation. In *Barbour* v. *Thomas, supra*, the stockholders of Detroit Bankers by reason of their ownership of stock in that corporation were held liable for the assessment made on the stock in First National owned by Detroit Bankers. The payment of such assessment made by the stockholders of Detroit Bankers has been held above to constitute additional cost of their stock. Since the assessment payments made under those circumstances were so directly related to the stock ownership in Detroit Bankers, and since the distributions in question were from the liquidation of the assets of an entity whose stock Detroit Bankers owned, and since the latter corporation was dissolved in 1933, it appears reasonable and proper to conclude that the distributions in question are to be regarded as received in liquidation

---

[3] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(c) DISTRIBUTION IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. * * *

of Detroit Bankers and in payment in exchange for its stock. Any other conclusion would disregard the actualities of the situation and the conclusions heretofore reached. The contention of the petitioners is sustained.

4. *Assessment paid with funds originating with the Estate of Frederick M. Alger, Sr., on shares owned by the Frederick M. Alger Trust and distributions made to Detroit Trust Company, trustee.*

On June 22, 1928, Frederick M. Alger, Sr., established a trust for the benefit of Mary E. Murphy, Frederick M. Alger, Jr., and Frances Alger Boyer. The trustee was the Detroit Trust Company. The trust held 665 shares of Detroit Bankers stock, and the assessment in respect to these shares was levied against the trust. It would have been necessary for the trust to sell some of its securities to obtain money to pay the assessment. The estate of Frederick M. Alger, Sr., had funds on hand sufficient for that purpose. Since the beneficiaries of the trust and the estate were identical and shared in the same proportions, they directed the executor of the estate to use cash which they then were, or would become, entitled to receive from the estate to pay the assessment. When the Federal estate tax return for the estate of Frederick M. Alger, Sr., was filed, disclosure of this trust was made therein, but no amount was included in the gross estate on account of the trust. After subsequent litigation the trust was determined to be includible in the gross estate and in computing the value of the trust the assessment on its shares of Detroit Bankers stock was deducted. Pursuant to the provisions of the trust agreement, one-fourth of the trust corpus was distributed to Frances Alger Boyer in 1939 and one-fourth was distributed to Frederick M. Alger, Jr., in 1942. The balance is held by the trustee for the benefit of Mary E. Murphy under the trust agreement.

Petitioners contend that they loaned money to the trust so that the trust could pay the assessment; that all they received during the years in question was a repayment of the original loan which could not conceivably be income.

Respondent contends that the estate, in fact, paid the assessment; that petitioners acquired the rights to recover the assessment as residuary legatees; and that pursuant to section 113 (a) (5) the basis to petitioners of such rights was zero. Respondent further contends that the executors paid the assessment. As we understand the facts, the estate, in effect, distributed to the petitioners the funds used for the payment of the assessment and they, in turn, advanced the funds to the trust. The amount so advanced became a liability of the trust

and was deducted in valuing the trust for Federal estate tax purposes. When the trust received distributions with respect to the assessment, it, in turn, paid them to Mary E. Murphy, Frederick M. Alger, Jr., and Frances Alger Boyer. In their hands the distributions were merely repayments of loans made by them to the trust and did not constitute income to them.

One of the errors assigned in the case of Mary E. Murphy is that the respondent failed to allow a capital loss carry-over from 1942 and 1943 against capital gains for 1946. In this connection the parties have stipulated that she had a capital loss carry-over to 1946 from the years 1942 and 1943 in the amount of $2,291.37 which she is entitled to offset against any capital gains occurring in 1946. In a re-computation of her deficiency for 1946, effect will be given to the stipulation.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*