William K. WARREN and Natalie O. Warren

v.

UNITED STATES.

Howard E. and Mabel H. FELT et al.

v.

UNITED STATES.

Nos. 73-55, 272-55.

United States Court of Claims.

April 8, 1959.

Jones, Chief Judge, dissented.

William P. McClure and John E. McClure, Washington, D. C., for plaintiffs. McClure & McClure, Washington, D. C., Cecil L. Smith and Kilgore & Kilgore, Dallas, Tex., were on the briefs.

C. Moxley Featherston, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland and Lyle M. Turner, Washington, D. C., were on the brief.

MADDEN, Judge.

The plaintiffs sue for the refund of a part of the income taxes paid by them for the years 1949 through 1952. They paid their taxes for these years on the basis that the income in question was ordinary income. Their claim in these suits is that the income was long-term capital gain, taxable at a lower rate.

In 1938 the Corpus Christi Corporation was organized under Texas law to acquire and develop oil and gas properties in some 8,782 acres of land in three counties in Texas. Of Corpus Christi's 5,000 shares of stock, The Chicago Corporation owned 1,250 and the other 3,-750 were owned by the plaintiffs and other persons.

By May 5, 1941, some 18 producing wells had been brought in on about 2,-200 acres of the property. The other 6,000 acres of the land had not been tested. A high-pressure recycling plant had been constructed to extract the salable distillate from the wet gas and reinject the dry gas into the earth to exert pressure on the wells. The necessary financing to continue and expand the development of the property was a problem to the plaintiffs and they sought to dispose of their stock in Corpus Christi. They negotiated with a number of individuals and corporations, including Chicago, which, as we have seen, already owned 20 percent of the stock of Corpus Christi. Chicago offered to buy the

stock of the other shareholders, if it could get enough of it so that it would hold at least 80 percent of the stock, the minimum amount required under Texas law to enable it to liquidate the corporation, and under section 112(b) (6) of the Internal Revenue Code of 1939, 26 U.S. C.A. § 112(b) (6), to accomplish the liquidation of a corporate subsidiary tax free. Chicago was to pay the selling shareholders $163.63 per share, plus an additional specified cash amount if the liquidation turned out to be, in fact, tax free. In addition, Chicago agreed to convey to each shareholder who sold his stock to Chicago, an "overriding royalty" in the oil, gas and other products of the Corpus Christi leases. In the gas and oil industry, an "overriding royalty" means a fraction of the working interest which by agreement is relieved of the expense of the development and production.

The sale of the Corpus Christi stock was accomplished and Corpus Christi was liquidated. In general terms the situation was, then, that the land owners who had made the leases to Corpus Christi had a royalty interest in the mineral products produced, presumably a one-eighth royalty interest, Chicago had the "working interest," presumably seven-eighths, which had formerly belonged to Corpus Christi, less the "overriding royalty" which Chicago had in the purchase of stock transaction, conveyed to the selling stockholders.

This small overriding royalty owned by the plaintiffs was, under Texas law, a property interest, Rogers National Bank of Jefferson v. Pewitt, Tex.Civ. App., 231 S.W.2d 487, and was recorded in the land records of the appropriate counties. In the agreement between Chicago and the plaintiffs creating the overriding royalty in the plaintiffs, Chicago, as the holder of the working interest in the leases, agreed to pay all the expenses of development, operation and exploration, and to diligently prosecute these activities. The plaintiffs had the right to take their share of the product in kind, or to give "division orders" to Chicago to sell their share of the products for their account and pay the money over to them. During all of the times pertinent in this suit such division orders were in effect.

In the plaintiffs' tax returns for 1941, the year in which they sold their Corpus Christi stock to Chicago, they reported as long-term capital gain the excess of the cash paid them by Chicago over what their Corpus Christi stock had cost them. They did not include in their capital gain any value for the overriding royalties which they received in the transaction, stating that those interests had no ascertainable market value. The taxing authorities, however, placed a value of $1,035,000 upon those interests of all the minority stockholders, and added proportionate parts of that amount to the capital gains of the plaintiffs. Presumably they paid taxes on these additional amounts of capital gain.

The properties proved highly productive. From July 1, 1941 to the end of 1956 Chicago remitted to the plaintiffs and the other former stockholders $11,-548,107.84 as the amount of the proceeds of their overriding royalty share of the products.

For the taxable years 1949 through 1952 here in question, the plaintiffs included, in their returns, their receipts from their royalty interests as ordinary income subject to the statutory $27\frac{1}{2}$ percent depletion allowance. So far as appears, they had also treated that income similarly for the years 1941 through 1948. For the years 1949 through 1952 they filed timely claims for refund on the ground that the receipts from their overriding royalties were additional amounts received by them as a part of the price of their sale of their Corpus Christi stock to Chicago in 1941, and should, therefore, be taxed at capital gains rates.

When the plaintiffs sold their Corpus Christi shares to Chicago in 1941 they, as we have seen, received some cash, a promise of some more cash if the purchaser was not required to pay a tax on its profit made out of the liquidation

of Corpus Christi, and the "overriding royalty" in the oil and gas. This last item was, as we have seen, a property interest. If it had been a more normal, more tangible kind of property, its value would as a matter of course have been added to the cash received, and the plaintiffs' gain would have been computed on the combined figure. If, although the property interest received was of an unusual nature, such as an overriding royalty, it had a market value which could be reasonably estimated, the same computation would be made. If such an estimation was made by the taxpayer, and the Government agreed to it, and the capital gain tax was paid on that basis, that would end the capital gain matter for that transaction, subject, presumably, to whatever rights the statutes give to either the taxpayer or the Government to reopen it within prescribed periods.

If the matter was closed in the manner just indicated, the subsequent tax treatment of the newly acquired property would be normal. If the property produced income, such as rent, the rent would be taxed as such. If, as an interest in oil or gas property, it produced oil or gas or the income from the sale of those minerals, the income would be taxed, after the deduction of the statutory depletion allowance.

The plaintiffs say that these normal consequences of the sale of property do not obtain in the instant case because the "property" which the Government says the plaintiffs received in the transaction with Chicago was not, they say, reasonably susceptible of valuation at the time they received it. The fact that the Government valued the overriding royalties of all of the holders of such interests at $1,035,000 in 1941, and the holders received, in the next fifteen years alone, $11,548,107.84 shows that the estimated value was a rough and inaccurate guess.

The plaintiffs say that whatever money they got in, as a consequence of the sale of their Corpus Christi stock, was a part of the sale price, though its receipt was unanticipated and delayed. If, as one item of consideration for the sale of property, the seller took in an empty apartment building in a ghost town, the building having a negligible market value, and shortly thereafter because of the location by the Government of an atomic or other large project in the area, the apartment building became a gold mine of income, the owner could truthfully say that the income was a consequence of his sale of his property and his receipt of the apartment building as a part of the price. But he could hardly say that his income from the apartment building, for all time to come or for any time, was deferred purchase money received from his sale.

The plaintiffs would, we suppose, distinguish the situation just described because, in the plaintiffs' case, Chicago as the owner of the working interest had agreed to do all of the operating and development and exploration work, and the plaintiffs had nothing to do but cash their royalty checks when, as and in whatever amounts they came in. But this is the situation of any owner of a royalty interest, and of any person who has income from bonds, notes, or stocks which pay dividends.

As to the controverted question of whether the plaintiffs' overriding royalties were, in 1941, reasonably susceptible of valuation, we have concluded that the question need not be answered. If, at the time the plaintiffs' capital gains were being computed for the 1941 transaction, the plaintiffs had sought a refund because the Government's valuation was too high, or the Government had assessed a deficiency because the plaintiffs' return showed too low a valuation, a court would have had to determine a valuation, or to decide that it was not possible to determine one. See Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143; Philadelphia Park Amusement Co. v. United States, 126 F.Supp. 184, 130 Ct.Cl. 166. If it did the latter, the further tax consequences would depend upon the nature of the interest found unsusceptible of valuation. If it

was income producing property, such as the apartment house referred to above, the Government would get its revenue by taxing the income as received, and by taxing the capital gain when the building was next sold, since it would have a low cost basis. If the interest found unsusceptible of valuation was not a property interest, and therefore not capable of producing ordinary income which could be taxed as such, any further receipts from such an interest would be additional payments of purchase price, further capital gains from the sale, and taxable as such. If one, for example, promised to pay $10,000 for a house, and to pay $5,000 more if he made a profit of $50,000 in a certain independent speculative venture in which he was engaged, the $5,000, if received, would be an addition to the sale price of the house, and taxable to the seller as capital gain. This was the situation in Burnet v. Logan, supra, and in Haynes v. United States, 50 F.Supp. 238, 100 Ct.Cl. 43, and Tuttle v. United States, 101 F.Supp. 532, 122 Ct.Cl. 1.

In the three cases just cited, the additional payments to be received were contingent upon the production of minerals from specified properties. The transactions did not, however, give to the contingent payee any property interest in the land or the minerals. None of the income from those properties was taxable to him as his income. He, of course, had a very lively "interest" in the fact that minerals should be produced from those properties, just as the man in the illustration above had an "interest" in the success of his purchaser's independent speculative venture.

It is apparent from what we have said that our view is that income received by an owner of a property interest is taxable to him as such, and that the fact that he received the property interest as a part of the sale price of property is irrelevant. The fact that the income is in large amounts only proves that he made a profitable deal when he accepted the property interest which later produced the income. The hope

and belief that, by an exchange of money for property, or property for other property, income will be increased because the property received will produce more income than the money or property parted with, is the motive for most commercial transactions. To select one type of such transactions, as the plaintiffs would have us do, for special treatment would introduce confusion into an already difficult field of taxation.

The plaintiffs' petitions will be dismissed.

It is so ordered.

MARIS, Circuit Judge (Retired), sitting by designation, and WHITAKER, Judge, concur.

JONES, Chief Judge (dissenting).

I respectfully dissent from the conclusion reached by the majority. The findings of fact clearly show that there was an outright sale of the Corpus Christi stock to The Chicago Corporation; that payment was made partly in cash and partly in overriding royalties.

These royalties were wholly unlike the house or apartment rental illustration which is used in the majority opinion. The royalties were a part of the corpus of the property and were in no ordinary sense a payment for a use of the property. It is as if the purchaser of the house or apartment in question has sold a 1/20 interest each year until the entire house or apartment had been disposed of.

In other words, every barrel of oil that is taken out of the ground is a part of the property itself, and when the oil has been taken out of the property by the royalty, the entire ownership is gone.

Although there were several steps involved, the deal through which plaintiffs' stock in Corpus Christi was sold to Chicago, partly for cash and partly in return for the overriding oil and gas royalties, was in reality a single transaction. As I view it, the controlling point in these cases is the fact that the overriding royalties received by plaintiffs had no ascertainable fair market value at

the time plaintiffs transferred their interests. In the many cases treating of oil and gas royalties for the purpose of deciding whether there has been a gain or loss under section 111 of the 1939 Internal Revenue Code, 26 U.S.C.A. § 111, for property sold or exchanged, it has always been held that the question of whether the royalties received by the taxpayer have an ascertainable fair market value is a question of fact. Where the factors affecting the valuation are so uncertain, contingent, or speculative that the value cannot be determined with reasonable accuracy, it must be held that the oil and gas interests have no fair market value. That is the situation here as found by the trial commissioner who heard and considered all the evidence bearing on the question. The reasons for this finding of lack of any market value at the time of the transfer are set out in findings 30, 31, and 32. For some reason the majority has seen fit to eliminate these findings.

I think these findings are vital and should be restored. They reveal the issue here to be very similar to that decided by the Supreme Court in Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143. The facts affecting the value of the overriding royalties in the instant cases contain more uncertain, unusual, and speculative elements than were present in other cases where it was held that the oil and gas interests considered had no ascertainable fair market value. Edwards Drilling Co. v. Commissioner, 35 B.T.A. 341; Rocky Mountain Development Co. v. Commissioner, 38 B.T.A. 1303. The facts before us show that the only petroleum product of any consequence recovered by Corpus Christi from the land up to the time plaintiffs' stocks were disposed of was wet gas. There was no market for the gas and the market for the distillate extracted therefrom was unstable and uncertain. Just prior to the closing of the transaction in suit, the only prospect held out to plaintiffs for recovering the money they had sunk in the venture was the revamping and enlarging of the recycling plant at an expenditure of $855,000 and by the drilling of additional oil wells. It was suggested that additional products could be recovered from the new plant but whether there would be a market for these and at what price was not known. Oil production was negligible and most of the property was unproven territory. The petroleum engineers who made the reports described in the findings pointed out the indefinite and unknown conditions existing in a considerable portion of the leased land and neither would hazard an estimate as to future oil production. As part of the price for plaintiffs' stocks, Chicago agreed to drill additional oil and gas wells, but as shown in finding 9, this obligation was subject to contingencies which might never occur.

Added to the above, we have the undisputed showing that plaintiffs failed in their efforts to have several major oil companies place a value upon or make an offer for the properties. Not only were no offers forthcoming, but one major oil company with extensive holdings in the same general area advised plaintiffs to dispose of their interests as quickly as possible.

The taxing authorities placed a value of $1,035,000 on the interests of the minority stockholders, but this valuation was, of necessity, a pure estimate. There are formulas and equations available for estimating the value of almost any kind of property where the use of such methods is appropriate. But estimates do not meet the statutory test of "fair market value." If these words mean anything, they assume, first, the existence of a market for the particular property, and, second, the presence of sufficient facts to enable fair-minded men to determine the value in that market within the bounds of reasonable accuracy. If the next day or shortly thereafter it had been shown that only dry holes could be found, there is not the slightest doubt that the plaintiffs could have come back and shown the inaccuracy of the collector's estimate, and could have on that ground secured a deduction

or a refund. In other words, these estimates are not necessarily final.

The facts in this record demonstrate that when plaintiffs' stocks were sold, the circumstances that would normally be relied upon to determine market value were shrouded in uncertainty and dependent upon the outcome of future developments. In the light of that record, I would adopt all the findings made by the trial commissioner and hold that since the overriding royalties had no ascertainable fair market value, the sale of plaintiffs' stocks resulted in an open transaction. On this basis, the payments received by plaintiffs from the sale of the oil and gas produced from the land would be taxable as long-term capital gain because of the open transaction aspect, but no allowance would be made to plaintiffs for depletion. Burnet v. Logan, supra; Commissioner of Internal Revenue v. Carter, 2 Cir., 170 F.2d 911.

LARAMORE, Judge, joins in the foregoing dissenting opinion.