Fred M. Waring and Virginia Waring v. Commissioner.
Waring v. Commissioner
Docket No. 3376-65.
United States Tax Court
T.C. Memo 1968-126; 1968 Tax Ct. Memo LEXIS 171; 27 T.C.M. (CCH) 604; T.C.M. (RIA) 68126; June 25, 1968, Filed Harvey R. Kitay, 515 Madison Ave., New York, N. Y., for the petitioners. Gerald Backer, for the respondent. FEATHERSTON
Memorandum Findings of *172 Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies of $2,926 for 1960 and $3,131 for 1961 in petitioners' income tax. The question presented is whether royalties received by petitioner in 1960 totaling $17,022 and in 1961 totaling $15,270 under an agreement distributed to petitioner in 1946 on the liquidation of Waring Corporation constitute ordinary income or capital gain. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by this reference. Petitioners Fred M. Waring and Virginia Waring are husband and wife, and resided at Shawnee-on-Delaware, Pennsylvania, at the time the petition and amended petition were filed. They filed joint Federal income tax returns for 1960 and 1961 with the district director of internal revenue at Scranton, Pennsylvania. Fred M. Waring will hereinafter be referred to as "petitioner." The Waring Corporation (sometimes hereinafter referred to as "the corporation") was organized in 1936 and was actively engaged in the development and distribution of certain electrical appliances from 1936 until November 1944, with the exception of a period during *173 World War II when the corporation's business was restricted by wartime regulations. It was liquidated on June 30, 1946. Petitioner was the corporation's principal stockholder and at the time of its liquidation was its sole stockholder. On or about June 23, 1937, Waring Corporation entered into an agreement with Fred J. Osius whereby Osius granted to Waring Corporation an exclusive license for the development and exploitation of a mixing device now commonly known as a blender. The agreement provided that Osius was to receive $1 for each blender sold, leased or otherwise disposed of. The license was terminable at the option of Osius if he received from the corporation less than $2,500 for any year beginning in calendar year 1938. This agreement was amended in minor respects on June 23, 1937, and December 23, 1937. On January 3, 1939, Osius transferred all his rights under the exclusive license agreement to trustees to receive the income and distribute it pursuant to the terms of the trust. Waring Corporation did not have facilities for the manufacture of blenders. It purchased and resold blenders manufactured for it by Air-Way Electrical Appliance Corporation. During the period 1937-1943, blenders *174 were sold primarily, though not exclusively, to commercial rather than consumer markets. The number of blenders sold by Waring Corporation for the years 1937-1943 was as follows: Number of
Year
Blenders
1937(from 7/1/37 to 12/31/37)
469
1938
14,743
1939
20,873
1940
18,114
1941
13,992
1942
15,505
1943 3,009
Total
86,705 During World War II, restrictions on the use of raw materials for civilian production at first curtailed and eventually prevented the manufacture of blenders. By 1944, war-time restrictions on the use of raw materials had brought production of blenders to a standstill. Waring Corporation encountered difficulties in obtaining replacement parts to service blenders previously sold. The corporation decided to dispose of the blender business, and also to dispose of its rights to distribute electric steam irons which it marketed under the trade name "Aluron" under a nonexclusive license. The corporation contacted Air-Way Electrical Appliance Corporation and General Electric Company, but neither was interested. Finally, on November 1, 1944, Waring Corporation entered into a series of agreements with 606 Electrical Appliances, Inc. *175 , a company formed to take over the business. One agreement assigned the corporation's license to manufacture and sell the blenders covered by the Osius agreement in return for a royalty based on net sales. The agreement between Osius and the Waring Corporation was subsequently amended to replace the "per unit" method of computing royalties with the "percentage of net sales" method. Another agreement between Waring Corporation and Electrical Appliances, Inc., for a stated royalty assigned all of the Waring Corporation's rights to manufacture, use and sell electric steam irons. A third agreement, the subject of this proceeding, involved the right to use certain trademarks and trade names. This agreement, headed "License Agreement", related to the trademark or trade name "Waring Blendor" and "Waring" as applied to mixing devices, and "Waring Aluron" and "Waring" as applied to electric steam irons. The agreement contains the following pertinent provisions concerning payments under the license: * * * (b) The term "fiscal year", as used in this Agreement, shall mean a period of twelve (12) calendar months commencing with the first day of the calendar month after the Licensee has commenced *176 to engage in quantity commercial production and sale of mixing devices and steam irons and each period of twelve (12) consecutive months thereafter. The Licensee shall be deemed to have commenced such quantity commercial production and sale for the purposes of this Agreement as soon as the Licensee has manufactured over a period of twelve (12) months or less, not less than 10,000 mixing devices or not less than 40,000 steam irons, available for general sale, or as soon as the net selling prices received by the Licensee upon general sales of either mixing devices or steam irons, or both, shall have aggregated the sum of One Hundred and Fifty Thousand ($150,000) Dollars, whichever first occurs. * * * 4. The Licensee shall pay to the Licensor for the licenses granted herein the following royalties: (a) Royalties equal to 5% of the net selling prices received by the Licensee for mixing devices and steam irons sold by the Licensee under the licensed trademarks or trade names in respect of sales made prior to the first fiscal year and like royalties during the first fiscal year until the royalties in such fiscal year aggregate the sum of Forty Thousand ($40,000) Dollars, which sum shall *177 constitute a minimum guaranteed royalty for the first fiscal year; thereafter, 2% of such net selling prices in respect of sales made during the balance of the first fiscal year; (b) Royalties equal to 5% of the net selling prices received by the Licensee for mixing devices and steam irons sold by the Licensee under the licensed trademarks or trade names in respect of sales made during the second fiscal year until such royalties aggregate Forty Thousand ($40,000) Dollars, which sum shall constitute a minimum guaranteed royalty for the second fiscal year; thereafter, royalties equal to 2% of such net selling prices in respect of sales made during the balance of the second fiscal year; (c) Royalties equal to 5% of the net selling prices received by the Licensee for mixing devices and steam irons sold by the Licensee under the licensed trademarks or trade names in respect of sales made during the third fiscal year until such royalties aggregate the sum of Forty Thousand ($40,000) Dollars, which sum shall constitute a minimum guaranteed royalty for the third fiscal year if, but only if, the net selling prices received by the Licensee in respect of which royalties are payable pursuant *178 to paragraphs 4(a) and 4(b) hereof have aggregated either Eight Hundred Thousand ($800,000) Dollars or more during each of the first and second fiscal years or One Million Six Hundred Thousand ($1,600,00) Dollars or more at the end of the second fiscal year; thereafter, royalties equal to 2% of such net selling prices in respect of sales made during the balance of the third fiscal year; (d) Royalties equal to 5% of the net selling prices received by Licensee for mixing devices and steam irons sold by the Licensee under the licensed trademarks or trade names in respect of sales made during the fourth fiscal year until such royalties aggregate the sum of Twenty Thousand ($20,000) Dollars, which sum shall constitute a minimum guaranteed royalty for the fourth fiscal year if, but only if, the net selling prices received by the Licensee in respect of which royalties are payable pursuant to paragraphs 4(a), 4(b) and 4(c) hereof have aggregated either Eight Hundred Thousand ($800,000) Dollars or more during each of the first, second and third fiscal years or Two Million Four Hundred Thousand ($2,400,000) Dollars or more at the end of the third fiscal year; thereafter, royalties equal to *179 2% of such net selling prices in respect of sales made during the balance of such fourth fiscal year; 607 (e) During the fifth fiscal year and during each fiscal year thereafter of the remaining term of this Agreement, royalties equal to 2 1/2% of the net selling prices received by the Licensee for mixing devices and steam irons sold by the Licensee under the licensed trade-marks or trade names in respect of sales made during each such fiscal year until such royalties aggregate in such fiscal year Five Thousand ($5,000) Dollars; thereafter, royalties equal to 2% of such net selling prices in respect of sales made during the balance of such fiscal year; provided, however, that if and when the total royalties paid and payable pursuant to this paragraph 4 shall at any time have aggregated the sum of Two Hundred Thousand ($200,000) Dollars, there shall be no minimum guaranteed royalty in respect of the fiscal year in which such total royalties have reached such sum or in any subsequent fiscal year, and the royalties payable pursuant to this paragraph 4 in respect of sales made by the Licensee during the balance of such fiscal year and in each subsequent fiscal year of this Agreement *180 shall be reduced to one-half of 1% of such net selling prices in respect of all sales thereafter made by the Licensee and shall continue to be one-half of 1% of such net selling prices in respect of all sales made by the Licensee during the remaining term of this Agreement. 5. (a) The term "net selling prices received by the Licensee for mixing devices and steam irons," as used in this Agreement, shall mean the net sums actually received by the Licensee from the sales of steam irons and mixing devices * * * in United States Dollars after deduction of discounts or other sales allowances and sales, use and excise taxes. * * * * * * 11. (a) This Agreement shall continue until November 1, 1954, and thereafter for additional periods of one year each; provided, however, that the Licensee may terminate this Agreement as of November 1, 1954, or as of November 1st of any subsequent one year period, by written notice to the Licensor to that effect given on or before September 1, 1954, or on or before September 1 of any subsequent one year period; and provided, further, that the Licensor may terminate this Agreement as of November 1, 1954, or as of November 1st of any subsequent one year *181 period, by written notice to the Licensee to that effect given on or before September 1, 1954, or on or before September 1 of any subsequent one year period, in the event that the total royalties paid and payable to the Licensor pursuant to paragraph 4 hereof shall, at the time of such notice, have aggregated less than the sum of Two Hundred Thousand ($200,000) Dollars. (b) Notwithstanding the provisions of paragraph 11 (a) hereof, this Agreement may be terminated by the Licensee on November 1, 1949, or on November 1 of any year thereafter, by written notice to the Licensor to that effect given on or before September 1, 1949, or on or before September 1 of any subsequent year, provided that the total royalties paid and payable to the Licensor pursuant to paragraph 4 hereof shall at the time of such notice have aggregated not less than the sum of Two Hundred Thousand ($200,000) Dollars. Paragraph 16 of the agreement provided for the settlement of disputes by arbitrators and named J. L. Cohen and T. Newman Lawlor (representing Waring Corporation) and V. Henry Rothschild, II and Oscar Kimmelman (representing Electrical Appliances, Inc.) as the board of arbitrators. The fourth agreement *182 between Waring Corporation and Electrical Appliances, Inc., entered into on November 1, 1944, was a letter agreement which provided for the latter to pay the sum of $10,000 to obtain for one year the services of Ed Lee, J. L. Cohen and Lenox S. Reid, officers and employees of the Waring Corporation. These officers were to "consult and advise" with Electrical Appliances, Inc., and "make available their sales and promotion experience and contacts", "from time to time" as requested "during the period of this contract." They were to render consultation services "in advising and assisting" in "the promotion, distribution and sale of the mixing device and steam iron." In addition to the payments received under the license agreement covering the trademarks and trade names described above, the Waring Corporation prior to its liquidation received the following amounts from Electrical Appliances, Inc.: For its tools
$ 25,000
For personal services of its employees under the letter agreement of No- vember 1, 1944
[1] 20,000
For the Aluron royalties provided in the sublicense described above
60,000
For its inventory 10,000
Total
$115,000
*183 The amounts of $60,000 and $20,000 constituted full payments of the obligations assumed by Electrical Appliances, Inc., under the terms of the sublicense agreement 608 and the letter agreement relating to services of employees, both dated November 1, 1944. Electrical Appliances, Inc. was a new corporation and as such had no prior experience in the manufacture and sale of appliances. It had no manufacturing or selling facilities and no assets in 1944. However, the key employees of Electrical Appliances, Inc., the licensee, were businessmen, some of whom were known to the officers of Waring Corporation as the West Coast distributor and later the national distributor of the blender. The management of Electrical Appliances, Inc. had experience in the manufacture of tapes, records and sound equipment. Prior to the date of Waring Corporation's liquidation, they had entered into an agreement with D.E. Sanford Company, a reliable business firm, to manufacture, advertise, distribute and demonstrate the Waring products. On June 30, 1946, Waring Corporation was *184 liquidated and all of its assets were distributed to petitioner in exchange for 100 percent of the stock of the corporation which he held. Upon such liquidation, petitioner received the license agreement with Electrical Appliances, Inc. and the other assets of the corporation. Petitioner, who was and still is an orchestra leader, did not take any active part in the operations of the corporation. He left the corporation's business, as well as the financial affairs, to his accountant, J. L. Cohen, and other officers of the corporation. Cohen, a certified public accountant, was first employed by Waring Corporation in 1938, when he became its comptroller. All books and records of the corporation were maintained under his supervision. He participated in the negotiation in 1944 of the transaction whereby Waring Corporation's blender and steam iron business was transferred to Electrical Appliances, Inc., including the negotiation of the license agreement involved in this proceeding. In connection with those negotiations, Cohen prepared statements showing the number of each type of blender sold each year from 1938 to 1943, as well as detailed profit or loss statements for each year. Cohen *185 prepared petitioner's income tax return for 1946 and all subsequent years. In Schedule D of the 1946 return $300,000 was reported as a long-term capital gain on liquidation of the corporation offset by deduction for the basis of the stock of $92,979 and reported as net capital gain of $207,021. Cohen did not discuss or consult with petitioner in determining the value of the license agreement to be included in the return. In the years prior to 1960 and 1961, principally in the period from 1946 through 1952, petitioner received $300,000 in royalties under the provisions of the license agreement covering the trademarks and trade names. He treated this sum as a return of capital and did not report any gain or loss upon the receipt of such amount. In the years 1960 and 1961 petitioner received $17,022 and $15,270, respectively, under such license agreement. He reported such amounts as long-term capital gains. In the statutory notice of deficiency respondent determined such amounts to constitute ordinary income. Ultimate Findings 1. The liquidation of Waring Corporation on June 30, 1946 in which petitioner received a license agreement between Waring Corporation and Electrical Appliances, *186 Inc. was a "closed" transaction. 2. The license agreement had a fair market value of $300,000 on June 30, 1946. Opinion The tax consequences of petitioner's exchange of stock on the distribution of assets in liquidation of Waring Corporation on June 30, 1946 were controlled by 1939 Code section 115(c) which provides that "[the] gain or loss to the distributee resulting from such exchange" shall be determined under section 111. Section 111(a) provides that the "gain from the sale or other disposition of property" is the excess of "the amount realized therefrom" over the adjusted basis. Section 111(b) defines "the amount realized from the sale or other disposition of property" to be the sum of the money received "plus the fair market value of the property (other than money) received." Where the fair market value of an obligation received in exchange for the stock of a liquidating corporation cannot be ascertained, it has been held that the original transaction remains open, and payments ultimately received under the obligation are treated as they would have been if received at the time *187 of the exchange. See, e.g., Commissioner v. Carter, 170 F. 2d 911 (C.A. 2, 1948), affirming 9 T.C. 364 (1947); Westover v. 609 Smith, 173 F. 2d 90 (C.A. 9, 1949). Petitioner contends that the license agreement of November 1, 1944, distributed to him on the liquidation of Waring Corporation on June 30, 1946, did not have an ascertainable fair market value, and that payments received in 1960 and 1961 pursuant to the agreement are therefore entitled to capital gains treatment under the corresponding provisions of the Internal Revenue Code of 1954. [2] Respondent contends that the license agreement had an ascertainable fair market value as of June 30, 1946, and that the liquidation was a "closed transaction." [3]
*188 It is only in "rare and extraordinary" circumstances that property received on liquidation of a corporation will be considered insusceptible of valuation, section 1.1001-1, Income Tax Regs.; Slater v. Commissioner, 356 F. 2d 668, 670, (C.A. 10, 1966), affirming a Memorandum Opinion of this Court. The burden here rested with petitioner to prove that the value of the license agreement could not be determined. See John W. Chamberlin, 32 T.C. 1098, 1106 (1959), affd. 286 F. 2d 850, 853 (C.A. 7, 1961). We are not convinced from the evidence presented that, despite the uncertainties surrounding the transaction, a reasonably accurate estimate of the value of the license agreement could not have been made, or that such value exceeded $300,000. We begin with the fact that Schedule D of petitioner's income tax return for 1946 showed a value of $300,000 for the license agreement. In the years prior to 1960 and 1961, principally in the period 1946 through 1952, petitioner received in excess of $300,000 in royalties under the license *189 agreement, which he treated as a return of capital and did not report any taxable gain on receipt of such amounts. The valuation of the license agreement in petitioner's 1946 return and his subsequent reporting of income consistent with such valuation over a period of years were admissions to which we give substantial weight. Grill v. United States, 303 F. 2d 922 (Ct. Cl., 1962); Campagna v. United States, 290 F. 2d 682, 684 (C.A. 2, 1961); Times Tribune Co., 20 T.C. 449, 452 (1953); cf. Marsack's Estate v. Commissioner, 288 F. 2d 533, 536 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court. See also Larchfield Corp. v. United States, 373 F. 2d 159 (C.A. 2, 1966); Andrews v. Commissioner, 38 F. 2d 55, 57 (C.A. 2, 1930). Petitioner seeks to avoid the effect of these admissions on two grounds. First, he relies on the testimony of J. L. Cohen, his accountant, that Cohen, not petitioner, prepared the returns and petitioner, an orchestra leader and musician, was personally furnished no information whatever of the possible value of the license agreement. Second, he points to Cohen's testimony *190 that Cohen was under the mistaken belief in preparing petitioner's 1946 return that he was obliged to prescribe some value for the license agreement; that he made no investigation of its value; that since petitioner was then "doing quite well" in 1946, Cohen thought it would be in petitioner's best interest to prepay some taxes, and, accordingly, Cohen prepared the 1946 return to report a value of $300,000 for the license agreement. But even if we assume, as petitioner contends, that the admission of a $300,000 value for the royalty agreement was that of Cohen rather than petitioner, Cohen was petitioner's agent. An admission by an agent within the scope and course of his agency is admissible against his principal. Murdock v. United States, 160 F. 2d 358, 361-362 (C.A. 8, 1947); Rogers v. Edward L. Burton & Co., 137 F. 2d 284, 286 (C.A. 10, 1945); United States v. United Shoe Machinery Corp., 89 F. Supp. 349 (D. Mass., 1950). And we are not convinced that Cohen picked the $300,000 figure "out of the air" and used it in the 1946 return merely to *191 cause petitioner to prepay some taxes. The facts are that Cohen, a certified public accountant with vast business experience, had been intimately connected with Waring Corporation since 1938, when he became its comptroller. He participated in the negotiation of the license agreement in 1944 and was named therein as one of the arbitrators to represent petitioner in the event of disagreements. In connection with the negotiations, Cohen prepared statements 610 showing the number of each type of blender sold each year from 1938 to 1943 and detailed profit or loss statements for each year. He was one of three officers of the Waring Corporation for whose consulting services the licensee, Electrical Appliances, Inc., agreed to pay Waring Corporation $10,000 and, it is stipulated, actually paid Waring Corporation $20,000 prior to June 30, 1946. By June 1946, when the corporation was liquidated, the war had ended and the manufacture and sale of blenders had been resumed. Cohen was fully aware of the business capabilities of the management of Electrical Appliances, Inc. and was privy to its distribution plans. We are convinced that Cohen had formulated a definite opinion as to the value *192 of the blender business, and that he arrived at the estimate of $300,000 by employing information and business judgment which he had acquired from his long association with Waring Corporation and his knowledge of the business planning done by Electrical Appliances, Inc. Petitioner cites numerous business uncertainties which prevailed on November 1, 1944, to support his contention that the license agreement could not be valued. He argues that blenders had little or no consumer acceptance prior to 1944; that appliance manufacturing was stopped by wartime restrictions on raw materials; that Electrical Appliances, Inc. was a new corporation with no previous experience in the field; and that it was unknown when production of civilian commodities would be resumed. Relying upon these uncertainties petitioner offered the expert testimony of J. L. Cohen and of a prominent writer and columnist whose work has been devoted largely to the appliance industry in support of his thesis that a reasonably accurate estimate could not be made of the value of the license agreement. The difficulty with petitioner's argument is twofold. First, the crucial date here is June 30, 1946, when Waring Corporation *193 was liquidated, not November 1, 1944, when the license agreement was negotiated. By June 30, 1946, many of the restrictions on production for civilian use had already been lifted or were reasonably expected to be lifted within the very near future. Indeed, as noted above, blenders were already being produced and sold. Second, while the uncertainties noted by petitioner might depress the value of the license agreement, they were not the type which made the agreement incapable of valuation. There can be no doubt, as explained in the expert testimony on behalf of respondent, that the trade name "Waring" or "Waring Blendor" carried with it substantial goodwill and public acceptance by June 30, 1946. Over 80,000 blenders had been sold in five pre-war years. Post-war production was already underway, and petitioner offered no evidence to show that the post-war sales were insufficient to provide a basis for a formal survey or the development of other basic data on which a business judgment could be made as to future sales. There is no showing that the business future of Electrical Appliances, Inc.'s blender business was any more uncertain than that of many other businesses which were bought *194 and sold in the period immediately following World War II. Indeed, the license agreement of November 1, 1944 clearly indicates on its face that business judgments as to future income were made in negotiating its terms. It recites that the trademark or trade name "Waring Blendor" and "Waring" had been extensively advertised and used in marketing mixing devices and that it was "expected that the Licensee will shortly be in a position to manufacture and sell mixing devices and steam irons [4] and in connection therewith to promote the sale of mixing devices and steam irons under said trademarks or trade names * * *." The agreement authorized Electrical Appliances, Inc. to use the trademark or trade name "Waring Blendor" or "Waring" applied to mixing devices of first class manufacture at least equal in quality, material and workmanship to the mixing devices which had been manufactured and sold under such trademark and trade name. The agreement, negotiated in the light of a six-year history of pre-war operations, provided for a basic royalty of five percent of the net selling price of blenders and steam irons subject to adjustments reducing the royalty rate if gross royalties exceeded *195 fixed amounts. The agreement provided for minimum guaranteed royalties of $40,000 per year for the first two fiscal years [5] of production and, if sales in preceding years exceeded 611 certain fixed amounts, $40,000 for the third year, $20,000 for the fourth year, and $5,000 for the fifth year. Upon payment of these minimum annual guaranteed royalties, the royalty rate was to be reduced to 2 percent. These provisions all indicate that business judgments were made by the parties even as early as November 1, 1944 as to the potential income to be derived from the manufacture and sale of blenders in the post-war period. *196 Valuation of property - particularly intangibles - necessarily involves an approximation based upon the factors indicating the price which would reasonably be paid by one hypothetical willing purchaser to an equally hypothetical willing seller who is under no compulsion to sell. Fixed rules or formulae for making the approximation can seldom be established. The result in each case may be no more than the best estimate reasonably to be reached. Commissioner v. Thompson, 222 F. 2d 893, 895 (C.A. 3, 1955), affirming 21 T.C. 448 (1954); Anderson v. Commissioner, 250 F. 2d 242, 249 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court, certiorari denied 356 U. S. 950 (1958); Alvary v. United States, 302 F. 2d 790, 795 (C.A. 2, 1962). Yet such estimates form the basis of numerous business transactions and are the grist of the judicial function. There is nothing so unique about a trademark or trade name - or a contract under which it was transferred - as to render it incapable of valuation. See, e.g., Webster Investors, Inc. v. Commissioner, 291 F. 2d 192 *197 (C.A. 2, 1961), affirming a Memorandum Opinion of this Court; Chamberlin v. Commissioner, supra at 853; Slater v. Commissioner, supra at 670. While the transaction here in question occurred more than 20 years ago, we are aided by a contemporaneous valuation of the license agreement by a highly experienced businessman and accountant, thoroughly grounded in the history of the blender business prior to the June 30, 1946 liquidation of Waring Corporation and fully informed of the plans of the licensee, Electrical Appliances, Inc., for subsequent development of the business. We have a license agreement which, on its face, prescribes minimum guaranteed royalty payments, thus indicating that business judgments were made in the course of its negotiation as to potential sales in the post-war period. The record as a whole does not convince us that the $300,000 valuation made in petitioner's 1946 income tax return was not reasonably accurate as of June 30, 1946. That the license agreement has subsequently produced larger sums of income than petitioner or his accountant visualized in 1946 provides no ground for a just complaint by petitioner at this time. This is quite simply not *198 the case of "a contract so speculative and contingent as to make impossible the ascertainment of market value." Marsack's Estate v. Commissioner, supra at 536; cf. Stephen H. Dorsey, 49 T.C. 606 (1968). We conclude that the fair market value of the license agreement was ascertainable with reasonable certainty on June 30, 1946, and that the value of the agreement did not exceed the $300,000 assigned it on petitioner's 1946 income tax return. Respondent's determination is sustained. Decision will be entered for respondent. Footnotes
1. Although the letter agreement apparently called for payment of $10,000, it is stipulated that this amount was received.↩
2. See sections 331, 1001, 1002, Internal Revenue Code of 1954↩. 3. The agreement of November 1, 1944 is couched in terms of "license" and "royalty," but respondent has not argued that the transfer was not a full assignment of Waring Corporation's rights to the trade name and trademark. Accordingly, we do not consider the doctrine of Warren v. United States, 171 F. Supp. 846↩ (Ct. Cl. 1959).
4. While the license agreement referred to Aluron steam irons as well as Waring Blendors, only income from the latter is involved in this proceeding. ↩
5. The first "flscal year" was defined to mean "a period of twelve (12) calendar months commencing with the first day of the calendar month after the Licensee has commenced to engage in quantity commercial production * * *." The term "quantity commercial production" was defined as the manufacture over a twelvemonth period of not less than 10,000 blenders 611 or not less than 40,000 steam irons available for general sale or when the net annual selling prices aggregated not less than $150,000. More than 10,000 blenders were sold in five pre-war years.↩